IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| JUAN CARLOS MELENDEZ-SERRANO | * | |
| Petitioner | * | Civil No. 20-1588 (WGY) |
| vs. | * | |
| ANA ESCOBAR PABON, et als | * | |
| Respondent | * | |
| *    *    *    *    *    *    *    * | | |

**<u>Petitioner's Brief in Favor of Granting of Writ of Habeas Corpus</u>**

HON. FRANCICO BESOSA
SENIOR UNITED STATES DISTRICT JUDGE
DISTRICT OF PUERTO RICO

COMES NOW Mr. Juan Carlos Melendez-Serrano, the defendant herein, represented by the undersigned, and before this Honorable Court respectfully states and prays:

***<u>Introduction</u>***

1. On Monday June 25, 1989, Hayde Maymi Rodriguez and her two young children, Eduardo and Melissa Morales Rodriguez, were murdered.

2. Juan Carlos Melendez Serrano and Antonio Ramos Cruz were charged with this murder. On April 10, 1992, they were found guilty and Mr. Melendez Serrano started serving three consecutive life sentences for a crime he did not commit.

3. Thru the advances in science, evidence has been discovered that supports what Mr. Melendez Serrano has alleged all along: that he is innocent. In real terms, he has spent 32 years paying for a crime he did not commit. He tried to uphold that, filing a motion for new trial in the Puerto Rico Court of First Instance ("Court of First Instance" or alternatively "Superior Court").

4. In an extensive, well researched and detailed Order, a valiant judge of the Superior Court agreed to grant a new trial. The Puerto Rico Court of Appeals disagreed, reversing the trial court, and the Puerto Rico Supreme Court failed to grant certiorari.

5. Mr. Melendez comes to this Court to vindicate his right to a new trial, as the Puerto Rico Court of Appeals erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law. Second, the Puerto Rico Court of Appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing."

6. Based on the arguments below, the Court should grant the petition, and order a new trial for Mr. Melendez Serrano.

### *I. Factual Background*

7. As the Court is aware, this Habeas petition has a companion case: *Ramos Cruz vs Emanuelli*, et al, Civil No. 20-1589 (FAB). Both Mr. Ramos Cruz and Mr. Melendez Serrano were charged with the same offence conduct, were tried together, and their appellate process was consolidated.

8. Due to a series of procedural events, *Ramos Cruz* proceeded at a more advanced pace. It was not until this case was transferred to this Courtroom that the litigation picked up steam. Accordingly, most of the road for this case was already walked in *Ramos Cruz*, to the point that an *Opinion and Order* was issued there, granting the writ and ordering the Commonwealth to hold a new trial. Indeed, Mr. Melendez Serrano will borrow extensively from that opinion in this brief.

9. As a result of the above, this Court is more than familiar with the facts here: they are the same for Mr. Melendez Serrano as they were for Mr. Ramos Cruz. In the *Amended Opinion and*

*Order* issued in Civil No. 20-1589 (FAB), granting Mr. Ramos Cruz' petition, the Court made

extensive and extremely detailed factual findings. Indeed, the factual findings cover the first 52

pages of the 80-pages *Amended Opinion and Order*. See *Ramos-Cruz*, 2024 U.S. Dist. LEXIS

179921 (D.P.R. Sept. 30, 2024).

   10. Rather than attempt to resume the complicated factual background, which would in the

best of scenarios take almost the same 50 pages, petitioner adopts those factual findings.[1]

### *II. Procedural Background* [2]

   11. Mr. Meléndez Serrano is serving three consecutive ninety-nine-year terms of

imprisonment for the murders of Haydée Teresa Maymí-Rodríguez ("Teresa") and her two

children, Eduardo Enrique and Melissa Morales-Maymí. See *Puerto Rico v. Meléndez*, CR-93-43

(P.R. Super. Ct. Jan. 26, 1999) (Judgment).

   12. Essentially, prosecutor Andrés Rodríguez Elías ("Rodríguez") alleged that Mr.

Meléndez Serrano and Antonio Ramos Cruz ("Ramos Cruz") attempted to sexually assault Teresa

at approximately 4:00 a.m. on June 25, 1989. *Ramos-Cruz v. Emanuelli-Hernández*, Civil No. 20-

1589, 2024 U.S. LEXIS 179921 (D.P.R. Sept. 30, 2024) (Besosa, J.). at *5 and 23. They then

purportedly stabbed Teresa and her children to death with a kitchen knife. Id.

   13. The joint trial was held before the Puerto Rico Court of First Instance, Carolina

Division. (Docket No. 47 at p. 7., admitted by respondents at docket 68, page 2) The jury returned

a guilty verdict for both defendants on April 10, 1992. (Docket No. 47 at p. 7.)

---

1. As will be argued infra, collateral estoppel as to the facts of the case applies.

2. Respondents moved, at docket 51, to dismiss the *Second Amended Petition* for habeas corpus relief. On October 28, 2024, at docket 64, the Court issued *Opinion and Order* denying the Commonwealth's motion. This procedural background section of the *Brief* cites liberally from pages 1 to 9 of the *Opinion and Order*.

14. Mr. Meléndez Serrano and Mr. Ramos Cruz subsequently filed direct appeals. Id. The Puerto Rico Court of Appeals affirmed their convictions on January 26, 1999, holding that "there was enough evidence for a jury to [infer] that all of the elements of murder in the first degree were present, and to connect the defendants to the crime." *Pueblo de P.R. v. Cruz*, Case No. KLCE201701397, 2019 WL 2232528, at *3 (P.R. Cir. Mar. 13, 2019) (Case No. 20-1589, Docket No. 52, Ex. 1) (certified English translation).

15. On January 29, 2016, the Puerto Rico legislature enacted the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34, sections 4201 et seq. *Cruz*, 2019 WL 2232528, at *4. The importance of this statute cannot be overstated in these proceedings, given that prior to its enactment the defense had no legal manner of forcing a comparison testing of DNA evidence in the Government's possession.

16. A month later, Meléndez and Ramos requested that the Superior Court allow the Puerto Rico Institute of Forensic Sciences ("IFS") perform an mtDNA analysis. Id. The Court of First Instance granted this motion without objection from the Puerto Rico Department of Justice. Id. This report excluded Meléndez and Ramos from the population of potential donors: The hairs on Teresa's underwear belong either to her (the victim) or a matrilineal relative. Id. at *5.

17. Meléndez and Ramos subsequently filed before the Court of First Instance a motion for a new trial pursuant to Rule 192.1. of the Puerto Rico Rules of Criminal Procedure.

18. To prevail on a Rule 192.1 motion, the petitioner must also establish the threshold questions that the newly discovered evidence "(1) could not have been discerned with reasonable diligence before trial; (2) is not merely cumulative; (3) is not rebuttal evidence; [and] (4) is

credible." (Docket No. 52, Ex. 1 at p. 16) (citing *Pueblo v. Rodríguez*, 193 D.P.R. 987, 998-1000

(2015)). Once the threshold issue is crossed, a new trial is warranted if:

> "upon analyzing the new evidence along with the [evidence] presented during the
> original trial in the manner most favorable to the guilty verdict or ruling being
> challenged, said evidence could have created reasonable doubt in the trier of facts
> as to the guilt of the petitioner."

*Cruz*, 2019 WL 2232528, at *18 (citing *Pueblo v. Marcano-Parrilla*, 152 D.P.R. 557 (2000))

(emphasis in original); see *Pueblo v. Morales-Rivera*, 1984 PR Sup. LEXIS 87 (official

translation), 115 D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions by "[asking]

whether said new evidence would have changed the guilty verdict in the present case").

    19. After extensive litigation, the Court of First Instance granted the motion under Rule

192.1 motion and ordered a new trial. Id. at *8. The mtDNA analysis was "relevant to the

controversy as to the identity of the person who committed the crime, and not merely cumulative

or rebuttal evidence." Id. According to Meléndez and Ramos, and as agreed by the Superior Court,

the mtDNA report "irrefutably reveals that the pubic hairs collected from the panties belonging to

Ms. Maymí do not belong to either of the two men unjustly convicted of this crime, whose motive

was sexual assault and that, consequently, they are excluded as the murderers of Ms. Maymí and

her two children." *Cruz*, 2019 WL 2232528, at *5.

    20. The Puerto Rico Department of Justice appealed. Id. at p. 9. The Puerto Rico Court of

Appeals, in a 2-1 opinion, determined that the mtDNA evidence could not have been discovered

in 1999, was not cumulative, and was credible. *Ramos Cruz*, 2019 WL 2232528, at *21-24. It

disagreed, however, with the proposition that mtDNA is more credible than hair comparison

despite explicit testimony that the mtDNA test is "more convincing." Id. at *24. The Puerto Rico

Court of Appeals reversed the Court of First Instance on May 7, 2019. Id. On November 1, 2019,

the Puerto Rico Supreme Court denied Meléndez and Ramos' subsequent petition for certiorari.

(Docket No. 47 at p. 10.)

21. After exhausting all state remedies, Mr. Meléndez Serrano filed a pro se section 2254

petition in this Court on October 27, 2020. (Docket no. 1.). The same was amended, being the

Second Amended Petition, docket no. 47, the operative allegations.

### III. Applicable Standard to Grant Remedy

22. U.S. Courts granting writs of habeas corpus do so under their inherent authority in

equity as "habeas corpus is, at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319

(1995). Congress recognizes federal courts' vast authority to decide habeas petitions "as law and

justice require." 28 U.S.C. § 2243. Such discretion is "necessary to make the habeas remedy

effective." *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001).

23. Federal habeas corpus review of a state-court conviction is governed by the Anti-

Terrorism and Effective Death Penalty Act. *Foxworth v. St. Amand*, 570 F.3d 414, 424 (1st Cir.

2009); 28 U.S.C. § 2254. Petitioners invoke the AEDPA to invalidate "the judgment authorizing

[their] confinement." *Magwood v. Patterson*, 561 U.S. 320, 321 (2010) (citation and quotation

omitted). Congress enacted this statute "to further the principles of comity, finality, and

federalism." *Kholi v. Wall*, 582 F.3d 147, 154 (1st Cir. 2009) (quoting *Williams v. Taylor*, 529

U.S. 420, 436 (2000)). Courts "shall entertain an application for a writ of habeas corpus . . . only

on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties

of the United States." 28 U.S.C. § 2254(a).

24. A state court conviction will survive habeas corpus review unless the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. § 2254(d). "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion [in this case the Puerto Rico Court of Appeals' decision vacating the new trial disposition], a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Porter v. Coyne-Fague*, 35 F.4th 68, 75 (1st Cir. 2022) (quoting *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)).

25. While federal courts give considerable deference to state court resolution of federal constitutional questions, writs of habeas corpus may issue to correct any "decision [that] was contrary to clearly established federal law as determined by the Supreme Court of the United States, or involved an unreasonable application of such definitive federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Cooper v. Bergeron*, 778 F.3d 294, 299 (1st Cir. 2015) (citing 28 U.S.C. § 2254(d)).

26. As a power in equity, the "fashioning" of writs of habeas corpus "rests uniquely within the discretion of the trial court." *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 377 (1st Cir. 1991).

### *IV. Argument*

*I. Applicability of Collateral Estoppel of the Fact Determined in the Amended Opinion and Order in Ramos Cruz vs Emanuelli, et al, Civil No. 20-1589 (FAB), published in 2024 U.S. Dist. LEXIS 179921 (D.P.R. Sept. 30, 2024)*

27. Collateral estoppel, i.e., encompasses the principle that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436 (1970), at 443. The Court further stated that the doctrine "is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." Id. at 444.

28. When risen, the courts must "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and consider whether a rational jury [or in this case the court in a bench determination] could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Id. (quoting Daniel K. Mayers and Fletcher L. Yarborough, Bis Vexari: New Trials and Successive Prosecutions, 74 HARV. L. REV. 1, 38–39 (1960)).

29. The question then becomes whether an issue was "necessarily decided" at a prior trial

30. As stated above, on Monday June 25, 1989, Hayde Maymi Rodriguez and her two young children, Eduardo and Melissa Morales Rodriguez, were murdered. Juan Carlos Melendez Serrano and Antonio Ramos Cruz were charged and found guilty of this murder. The trial was a joint trial, the evidence presented was the same while they sat side by side; their motion for new trial upon new evidence were consolidated for they presented the same arguments and were litigated jointly with the Superior Court receiving the same testimony with a identical ruling; and their appellate process in the Puerto Rico Court of Appeals were also consolidated, to the point of

being argued jointly and ruled upon identically; the Puerto Rico Supreme Court gave the same number to both cases. The habeas petitions before this federal Court were filed on the same date and are cases 20-1588 and 20-1589. For all practical purposes of this litigation, they are the same case.

31. Due to a series of procedural events, *Ramos Cruz* proceeded at a much faster clip. It was not until this case was transferred to this Courtroom that the litigation picked up steam. Accordingly, most of the road for this case was already walked in *Ramos Cruz*, to the point that an *Opinion and Order* has already been issued there, granting the writ and ordering the Commonwealth to hold a new trial for Mr. Ramos Cruz.

32. In this habeas proceeding the petitions of Mr. Melendez Serrano and of respondents have been similar if not identical to those in *Ramos Cruz*. The transcripts filed with the District Court are the same.

33. Given the correspondence of allegations, facts, evidence and defenses, it is forced to conclude that the issues of fact that are to be ruled upon here were "necessarily decided" in *Ramos Cruz*.

34. The Court should adopt its conclusions of facts from *Ramos Cruz* and apply them to this case.

### *II. The Puerto Rico Court of Appeals Erred by Applying the Incorrect Legal and Factual Standards in Evaluating the Motion for New Trial*

35. The distinction between legal analysis and findings of fact is paramount. Section 2254(d)(1) governs the petitioner's request for habeas corpus relief if the state court "[applied] a legal rule that contradicts an established Supreme Court precedent or [reached] a different result on facts materially indistinguishable from those of a controlling Supreme Court precedent."

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (quoting 28 U.S.C. § 2254(d)(1)). In contrast, a "state court's factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence [pursuant to sections 2254(d)(2) and 2254(e)(1)]." *Ouber v. Guarino*, 293 F.3d 19, 27 (2002).

36. However, distinguishing questions of law from fact "is sometimes slippery." *Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995) (citing *Wainwright v. Witt*, 469 U.S. 412, 429 (1985) ("It will not always be easy to separate questions of 'fact' from 'mixed questions of law and fact' for section 2254(d) purposes.")).

37. The First Circuit Court of Appeals has held that section 2254(d)(1) applies exclusively to determinations of "basic, primary, or historical fact," while inferences, characterizations of the facts, and mixed questions of fact and law generally fall within the purview of section 2254(d)(1). *Ouber*, 293 F.3d at 27. Section 2254(d)(1), the province of mixed questions of law and fact, encompasses the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963). Courts have applied section 2254(d)(2) to habeas corpus petitions involving questions that extend beyond the historical facts of the case. See *Maggio v. Fulford*, 462 U.S. 11, 117 (1983) (per curium) (applying section 2254(d)(2) to questions concerning the defendant's competency to stand trial); *Wainwright*, 469 U.S. at 429 ("The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the 'factual issues that are subject to section 2254(d)."); *Tolbert v. Page*, 182 F.3d 677, 684 (9th Cir. 1999) (applying section 2254(d)(1) to the state court's determination regarding prima facie showing of racial discrimination and

discriminatory intent pursuant to *Batson*); *Jeffreis v. Blodgett*, 5 F.3d 1180, 1189 (9th Cir. 1993)

(applying section 2254(d)(2) to a question of alleged jury bias resulting from pretrial publicity).

38. The District Court in *Cruz Serrano* determined that section 2254(d)(2) is the operative

habeas corpus provision because this assessment constitutes a "[fact] in the sense of a recital of

external events and the credibility of their narrators." *Sanna v. Dipaolo*, 265 F.3d 1, 7 (1st Cir.

2001) (citation omitted).

39. However, in this Brief Mr. Serrano will argue violation under both standards.

*A. Puerto Rico Court of Appeals erred in concluding that the new mitochondrial DNA evidence
was not likely to change the result at trial, in violation of clearly established federal law*

40. The Puerto Rico Court of Appeals' decision violated Puerto Rico law and violated Due

Process. In adjudicating a motion for a new trial under Rule 192, the Supreme Court of Puerto

Rico has adopted the so-called *Berry* rule. *Pueblo v. Torres Feliciano*, 201 D.P.R. 63, 71 (2018)

(citing *Berry v. State*, 11 Ga. 511, 527 (1852)); see also *United States v. Street*, 570 F.2d 1, 4 (1st

Cir. 1977) (adopting the *Berry* rule in this circuit as a matter of federal law). Under the *Berry* rule,

as interpreted by the Supreme Court of Puerto Rico, a sentencing court reviewing a motion for

new trial based on new evidence must grant that motion when the new evidence:

> (1) could not have been discovered with reasonable diligence prior to trial; (2) is
> not merely cumulative; (3) is not merely impeaching; (4) is credible and (5) would
> probably produce a different result.

*Torres Feliciano*, 201 D.P.R. at 71 (unofficial translation). This was the standard Puerto Rico

courts needed to apply in adjudicating a motion for new trial at the time that the Court of First

Instance decided Mr. Melendez Serrano's motion—and it was the standard the Court of First

Instance applied in this case. *See* the opinion of the Puerto Rico Court of Appeals, at page 29,

citing the proper standard, and noting the lower court applied it.

41. The Puerto Rico Court of Appeals violated the Due Process Clause by arbitrarily imposing a higher "innocence" standard to the motion for a new trial instead of the correct "would probably produce a different result" standard. In reviewing the lower court order for abuse of discretion, at page 17 of its opinion, the Court of Appeals departed from the *Berry* rule's fifth prong, as described above. Rather than asking whether the new evidence "would probably produce a different result," *Torres Feliciano*, 201 D.P.R. at 71, the Court of Appeals required Mr. Melendez Serrano to show "that it is more probable that [he was] innocent than guilty." Court of Appeals opinion at 16; see also id. at 21 ("this new evidence does not make it more probable that the respondents are innocent"), id. at 6 ("the scientific tests, considered in light of the evidence of the prosecution presented during the original trial, do not make it more probable that the convicts are innocent instead of guilty"). This was a clear violation of the *Berry* rule as interpreted by the Supreme Court of Puerto Rico, and therefore a violation of Mr. Ramos's Due Process rights under *Hicks* and its progeny.

42. Rule 192 of Puerto Rico Criminal Procedure allows Puerto Rico courts to consider closing arguments on a motion for new trial based on new evidence. P.R. Laws Ann. tit. 34, App. II, R. 192, 192.1. As noted above, Puerto Rico courts apply the *Berry* rule, which requires a movant to show that the new evidence would probably result in a different outcome if presented to a jury. *Torres Feliciano*, 201 D.P.R. at 71. As part of this probability and materiality analysis, Puerto Rico courts consider whether the new evidence "can affect the case and then assess whether the net effect of such evidence, in light of all the evidence admitted at trial, is of such magnitude that it sheds a different light on the case and undermines confidence in the guilty verdict." *Torres Feliciano*, 201 D.P.R. at 76 (unofficial translation).

43. Because a court deciding a Rule 192 motion must consider that totality of the evidence and its effect on the jury's verdict, that court may consider how the new evidence fits into the prosecutions or the defense's theory of a case. See, e.g., *Pueblo v. Rodríguez*, 193 D.P.R. 987, 1009 (2015) (considering how new evidence fit into the defense's theory of the case); *Pueblo v. Velázquez Colón,* 174 D.P.R. 304, 349 (2008) (considering how the prosecution characterized certain evidence to the jury).

44. This includes considering how a prosecution's opening and closing arguments characterize and contextualize certain evidence. Here, the new mitochondrial DNA evidence at issue concerned hairs found on the victim's underwear. Court of Appeals at 19. The new mitochondrial DNA evidence definitively established that these hairs did not belong to Mr. Melendez Serrano. Id. at 7-8 (citing testimony of DNA defense expert Phillip Hopper). At trial, however, the prosecution insinuated that these hairs could have belonged to Mr. Melendez Serrano. This was evident from the prosecution's closing and: (1) the emphasis prosecutors placed on the fact that the victim shaved her pubic area, suggesting they could not have belonged to her, id. at 6, 24 (describing evidence presented at trial); and (2) the fact the hairs were found in the victim's underwear, suggesting they would have belonged to an aggressor, id. at 5 (describing same). Moreover, as also evidenced by closing argument in the original trial, these hairs would have been central to the prosecution's theory of the case that the accused had sought to rape the victim before killing her.

45. The Court of Appeals ignored the parties' theory of the case at trial—and specifically the prosecution's central thesis that Mr. Melendez Serrano and his co-defendant supposedly raped and killed the victim. The Court of Appeals' oversight was not, by itself, an unreasonable factual

determination, but rather a legal error that doomed its analysis of the order granting Mr. Melendez Serrano a new trial and violated Mr. Melendez Serrano's Due Process rights. As explained above, in deciding whether to grant the motion for a new trial, the Court of First Instance properly assessed the materiality of the new evidence, and the probability that it would have altered the jury's verdict. Part of this analysis included evaluating what role the hairs found in the victim's underwear played at trial, and in the prosecution's theory of the case. The Court of Appeals erred when it ignored the centrality of these hairs to the prosecution's rape-and-murder theory.

46. For these reasons, and those set forth in the Petitioner's filings, the Court of Appeals failed to apply the proper legal standards under *Berry* and Puerto Rico law and violated Mr. Melendez Serrano's Due Process rights.

#### *B. The Puerto Rico Court of Appeals relied on an unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing* [3]

47. The Court of First Instance granted Mr. Melendez Serrano' motion for a new trial on June 13, 2017, holding that the "results of the DNA tests [. . .] is the type of new evidence that would make a different result probable." *Ramos Cruz*, 2019 WL 2232528, at *9. This disposition was issued after a three-day evidentiary hearing and oral argument.

48. On March 13, 2019, the Court of Appeals held that the "Court of First Instance clearly and unequivocally abused its discretion when it granted a new trial to [Ramos and Meléndez]." *Ramos Cruz*, 2019 WL 2232528, at *12. This decision is fraught with unreasonable factual determinations, however, compelling this Court to grant the relief requested by Mr. Melendez Serrano, just as it did to Mr. Ramos Cruz. Specifically, the factual determinations regarding the

---

3 As in other sections, the Brief in this section borrows liberally and very extensively from the *Opinion and Order* in *Ramos Cruz*.

fifth prong of the Rule 192.1 analysis rest on the Court of Appeals flawed and incomplete rendition

of the record.

49. As a preliminary matter, the court of appeals' decision contains dicta that is inconsistent

with the record. The court of appeals disagreed with the Court of First Instance's finding that "the

mtDNA is more convincing, conclusive and discriminating than the microscopic hair comparison."

Cruz, 2019 WL 2232528, at *22. The testimony disagrees.

50. Forensic serologist Roberto López-Arroyo ("López") stated that he conducts a hair

comparison by "basically [placing] the hairs on a slide [under] a microscope and [observing]

them." The comparison "depends on the [analyst's] power of observation." Id. at p. 60. López

examined the sample and reference hairs, concluding that Ramos and Meléndez "were excluded"

as donors. Id. at p. 25. His report stated, however, that the hairs "must be submitted to a

mitochondrial DNA analysis." Id. at p. 27.

51. Phillip Hopper ("Hopper"), a DNA analyst at the Serological Research Institute,

testified that after DNA is extracted from a sample hair strand:

> mitochondrial DNA is copied in a process called amplification to make more copies
> of the mitochondrial DNA so [that analysts] can determine the exact sequence of
> [a] small portion of the mitochondrial DNA present in the hair.

52. Analysts then identify the four components that comprise the "structure of DNA," label

these components with "different color dyes," and "determine the exact order" of the resulting

sequence. Id. at p. 18. "Once a sequence is determined, [analysts] can compare that sequence to

the sequence from the victim [and] suspect." Id. at p. 18. The mtDNA conducted by Hopper

revealed that "the hairs from [Teresa's] clothing was different from the sequence of Mr. Meléndez

and Mr. Ramos." Id. at p. 22. In Hopper's opinion, "the hairs found on [Teresa] could not have originated from the two suspects." Id.

53. López and Hopper both testified that the mtDNA analysis is more conclusive than a microscopic hair comparison. Indeed, Hopper disclosed that "[hairs] from different people can look similar," and that he previously "tested other hairs which look similar [but] ended up giving different mitochondrial results." The Court recognizes that microscopic hair comparison may, in certain circumstances, constitute credible evidence. To undermine the Court of First Instance's determination that a mtDNA analysis is more conclusive than a microscopic hair comparison, however, defies logic and disregards testimony presented at the Rule 192.1 hearing. Moreover, the Court of First Instance's determination regarding microscopic hair comparison corresponds to prevailing beliefs among the scientific community.

54. Indeed, in 2009, the National Academies of Science determined that "testimony linking microscopic hair analysis with a particular defendant is highly unreliable. In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value." Nat'l Academies of Sci., Strengthening Forensic Science in the United States (2009); see Smuel D. Hodge, Jr. and Amelia Holjencin, A post-Morten Review of Forensic Hair Analysis: A Technique Whose Current Use in Criminal Investigations in Hanging on by a Hair, 64 St. Louis L.J. 219, 228 (2020) ("The death knell of microscopic hair analysis in a forensic context occurred in April 2015 when the FBI issued a bombshell admission that members of its staff had provided inaccurate testimony dealing with microscopic hair analysis for more than twenty years thereby leading to the conviction of innocent people.").

### (a) No Evidence Suggests that the Court of First Instance Omitted Facts From its Rule 192.1 Analysis

55. The Supreme Court has held that a state appellate court's "determination of what the trial judge found is an issue of historical fact" subject to review pursuant to sections 2254(d)(2) and 2254(e)(1). Parker v. Dugger, 498 U.S. 308, 320 (1991) ("What the Florida Supreme Court could not do, but what it did, was to ignore the evidence of mitigating circumstances in the record and misread the trial judge's finding regarding mitigating circumstances, and affirm the sentence based on a mischaracterization of the trial judge's findings."); see *Williams v. Rhodes*, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On habeas review, state appellate court findings – including those that interpret unclear or ambiguous trial court rulings – are entitled to the same presumption of corrections that we afford trial court findings" pursuant to section 2254(e)(1)). Accordingly, the court of appeals' "determination of what [the Court of First Instance] said" is subject to habeas corpus review pursuant to sections 2254(d)(2) and 2254(e)(1).

56. The court of appeals misconstrued the Court of First Instance's opinion and order, holding that the Court of First Instance "ignored important facts that could not be disregarded and, at the same time, assigned great weight and value to irrelevant and immaterial facts, clearly abusing its discretion." *Ramos Cruz*, 2019 WL 2232528, at *22 (emphasis added). For instance, the Court of First Instance cited testimony adduced by Eluzmindrina Feliciano-González, who placed Morales at Teresa's residence on June 27, 1989. Id.; see Docket No. 68, Ex. 8. The court of appeals held, however, that the Court of First Instance "omitted the fact that during the trial a second visual inspection was carried out for the sole purpose of verifying said testimony, since there was a distance of ten (10) houses between her house and the victim's house." Id. (emphasis added). The Court of First Instance allegedly "disregarded the testimonies of the auto mechanic, Frank Álvarez-

Navaro, and of Mr. Mario Antonio Salgado-Castrello ["Salgado"], as to the vehicle belonging to Mr. Eduardo Morales." Id. at *26 (emphasis added). Moreover, the court of appeals held that the "Court of First Instance erred when it failed to assess all of the evidence admitted during the trial, and only considered part of the testimony to conclude that the new evidence would probably produce a different result." Id. at *27 (emphasis added). According to the court of appeals, the Court of First Instance "should not have ignored the strength of the evidence presented in the trial, an important factor to be taken into account when considering a motion for a new trial." Id. at *29 (emphasis added). The Court of First Instance purportedly "[ignored], without any reason, the circumstantial evidence that was submitted during the trial." Id. at *29 (emphasis added).

57. The Court of First Instance and court of appeals' assessments of the evidence differed from each other. This disagreement does not, however, prove that the Court of First Instance "ignored," "disregarded," "omitted," or "failed to assess" evidence. A court need not enumerate every fact it considered in adjudicating a motion for a new trial in its written disposition. Rule 192.1 mandates that Puerto Rico courts analyze "new evidence along with the [evidence] presented during the original trial in the manner most favorable to the guilty verdict." Id. at *18 (citing *Marcano-Parrilla*, 152 D.P.R. 557). Nothing in the record suggests that the Court of First Instance ignored or omitted facts in its analysis. In fact, the Court of First Instance reviewed the trial evidence and listed exhibits provided by the Puerto Rico Supreme Court. The litigants also provided the Court of First Instance with the trial transcripts. Essentially, the absence of a fact in an opinion and order does not necessarily establish that the court issuing the disposition omitted or ignored this fact in its concomitant analysis.

58. The court of appeals faults the Court of First Instance for not considering certain testimony from the trial record, a conclusion based on a premise that has no support in the record. Barring evidence to the contrary, an appellate court presumes that the trial judge reviewed the record. See, e.g., *United States v. Wilfred Am. Educ. Corp.*, 953 F.2d 717, 719-20 (1st Cir. 1992) ("We will not presume that the district court declined to consider the relevant section 3622(a) evidence contained in the record"); *United States v. Sutton*, 105 F.4th 1083, 1088 (8th Cir. 2024) ("We assume the record before us is a complete record of the materials that the district court viewed and considered). For example, the court of appeals refrained from addressing law enforcement's failure to preserve the crime scene or the discovery of the purported murder weapon at Morales' house months after the murders. This Court cannot infer, based on this premise alone, that the court of appeals ignored the haphazard destruction of evidence and questionable discovery of the knife in conducting its analysis.

59. The court of appeals' flawed interpretation of the Court of First Instance Rule 192.1 decision constitutes an "unreasonable determination of the facts." 28 U.S.C. §§ 2254(d)(1)-(e)(1).

*(b) The Court of Appeals Misconstrued the Trial Evidence*

60. The court of appeals based its decision on an erroneous assessment of the record, constituting an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. In 1992, Bárbara and José both claimed that Ramos and Meléndez manufactured an "excuse" to enter Teresa's house on the night of her murder. José revealed that these fabrications served a singular purpose: to sexually assault Teresa. Testimony pertaining to this purported scheme is set forth below.

Rodríguez: Mr. Witness, can you tell the ladies and gentlemen of the Jury what, if anything, happened once you arrived and placed yourself underneath that light pole, joining Mr. Juan Carlos Meléndez and Antonio Ramos-Cruz?

José: At that time, well, when my sister left [Teresa's] house and went to my house, uh . . . I stayed with them and we started making small talk . . .

Rodríguez: Talking. What was that small talk?

José: You know, ordinary things, uh, things about work, and then we started talking about Teresa . . .

Rodríguez: What did you talk about Teresa?

José: Uh . . . what she was like, how she was, that she was really hot [. . .] And then, at that time we started talking jokingly about how to get with her to put it in her.

Rodríguez: To put it in her . . . In other words, who was in that conversation there at that time?

José: [Meléndez] and [Ramos]

[. . .]

Rodríguez: What, if anything, did you do when [Meléndez] mentioned the fact about putting it inside Teresa?

José: Well, at the moment . . . uh . . . at the moment I laughed . . . since we were joking around, I didn't take it seriously [. . .] and pretty much, no, like they say, I didn't, I didn't have that malice, and when he told me that, I kind of went with the flow, right? And at that moment we kept talking about that . . .

Rodríguez: What else did you talk about?

José: Well, how to get inside [Teresa's] house, uh, like how we were going to get inside [. . .] we were going to go inside, if when she came out, we were going to go inside, some excuse [. . .] At that time, well, Teresa came outside . . .

[. . .]

Rodríguez: And what happened when [Ramos or Meléndez] asked Teresa for water? If anything happened?

> José: At that time, I was going to go to . . . to my house but one of them said, "This
> is the opportunity," and I said "Opportunity to what?" "To deal with her." And I
> said, "No, no, no, I am not going to be doing that; I am not going to be in the plot.
> "No, you sissy; fuck off." And then, well, I didn't . . . I ignored them and I left.

> (Docket No. 68, Ex. 6 at pp. 92-97.)

> Bárbara: At that point [Meléndez] told me to take [Teresa's] key . . .
>      [. . .]

> Rodríguez: The keys to what?

> Bárbara: To the house.

> Rodríguez: for what, if you know?

> Bárbara: I asked him, and he told me in order to have an excuse to talk to her. I
> went up to [Teresa's] house for moment and took them.

(Docket No. 68, Ex. 8, at p. 226-27.) Testimony provided by the Martínez siblings served as the sole evidence linking Ramos and Meléndez to the crime scene. No other circumstantial or physical evidence placed them inside Teresa's house in the early morning hours of June 26, 1989.

61. The mtDNA analysis performed on the hairs collected from Teresa's underwear excluded Ramos and Meléndez as the donors: The hairs originated from Teresa herself or a matrilineal relative. Consequently, these results undermine critical testimony adduced at trial by Bárbara and José. Ramos and Meléndez allegedly conspired for hours on Calle 2 in Trujillo Alto, conjuring an excuse to initiate a conversation with Teresa to "put it in her." See *Ramos Cruz*, 2019 WL 2232528, at *37 ("If there's one thing that the undersigned judge can be sure it is that the only place that sexual aggression was eliminated from in these proceedings was from the charges, since the transcription of the trial on the merits indicates that the sexual act was the motivation for the commission of the crime of murder.") (Salgado-Schwarz, J., dissenting). By eliminating Ramos and Meléndez as the source of the pubic hair recovered from the murder victim's underwear, the

mtDNA analysis tends to negate the proposition that they sexually assaulted Teresa. This evidence

contradicts the narratives presented by Bárbara and José.

62. The court of appeals stated that "it [did] not examine the theories of the parties stated

in their final reports contained in the transcripts of the evidence of the original trial because they

do not constitute evidence." *22. It did, however, in the following sections of its opinion. The court

of appeals determined that "a different result from the guilty verdict would probably [not] be

reached" in part because the "District Attorney argued during the trial that the motive of the murder

was having sexual relations with the victim (enjoying her)." *Ramos Cruz*, 2019 WL 2232528, at

*31.

63. The court of appeals assumed an extreme position, denying that the mtDNA analysis

is relevant and material in any way to this case despite clear and convincing evidence to the

contrary. It repeated this misguided proposition throughout its decision, stating that:

> "The results of the mtDNA test as new supplementary evidence do not rebut the
> testimony of the Martínez siblings (in terms of credibility), and much less do they
> change the central facts as narrated by them and believed by the jury." *Ramos Cruz*,
> 2019 WL 2232528, at *28.

> "In short, the new evidence of the mtDNA results does not in any way diminish the
> evidentiary value of the testimony discussed [in the Court of Appeals' opinion]."
> Id.

> "[The mtDNA analysis] also does not allow us to rebut any of the central facts
> proven during the trial to create any doubt in terms of a third person being in the
> time and place of the murders." Id.

> "Furthermore, the new evidence alluded to by [Ramos and Meléndez] does not add
> or subtract any evidentiary value from the evidence presented during trial." Id.

> "[The] new supplementary evidence submitted lacks the element of having a certain
> level of importance with regards to the evidence submitted at trial." Id. at *31.

"The defense's theory and the grounds on which they base their request for a new trial in no way rebut, minimize, or refute all of the evidence weighed by the jury in the trial resulting in the verdict of guilty." Id.32

"We reiterate that the results of the mtDNA test have no use whatsoever to place [Ramos and Meléndez] outside of the scene of the crime." Id. at *31.

"The new supplementary evidence also does not satisfy, as we have seen, the degree of relevance and sufficiency to rebut all the evidence submitted at trial." Id.

"[We] are forced to conclude that the new supplementary evidence does not have a direct of proportional relationship to the main fact that [Ramos and Meléndez] seek to prove, that is, that they are excluded in a true and incontrovertible manner from being at the scene of the crime or from having any contact with [Teresa] or her children." Id. at *32.

64. The court of appeals repeatedly diminished the mtDNA analysis, failing to grasp the following fact: proof tending to exclude would-be rapists from a murder scene, particularly when sexual assault allegedly motivated the suspects in committing this offense, is relevant. See *Espinal v. Bennett*, 588 F. Supp. 2d 388, 418 (E.D.N.Y. 2008) (granting a habeas corpus petition pursuant to section 2254(d)(2) because the "state court unreasonably assessed the facts of this case by concluding that the redacted report did not support the petitioner's alibi claims"). Jurists may dispute the proper weight to assign the mtDNA analysis, but to completely reject the materiality of this evidence is an unreasonable determination of the facts. See *Miller-El v. Cockrell*, 537 U.S. 322 (3002) at 340 ("A federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

65. The court of appeals committed the same error regarding Teresa's underwear. It held that "the female lingerie, as an article of evidence against [Ramos and Meléndez], was not material with regards to the guilty verdict." *Ramos Cruz*, 2019 WL 2232528, at *30. According to the court

of appeals, "the article of female clothing lacks relevance to prove the elements of the crimes of

murder or a violation of the Weapons Act of which respondents were accused and found guilty."

Id. Medical technologist Leida Rodríguez-Vélez testified, however, that there "was an absence of

semen" on Teresa's shorts, underwear, and sweater. (Docket No. 68, Ex. 1) Luis Campos observed

pink underwear on Teresa at the crime scene. (Docket No. 68, Ex. 8) The court of appeals'

classification of this evidence belies the trial record, constituting an unreasonable determination

of fact.

### *V. Remedy Requested*

66. This Court defers to the court of appeals' factual determinations pursuant to section

2254. *Dunn v. Reeves*, 584 U.S. 731, 733 (2021) ("Federal habeas courts must defer to reasonable

state-court decisions").

67. Deference does not, however, imply abandonment or abdication of judicial review.

Deference does not by definition preclude relief." Miller-El, 537 U.S. at 340. The record

demonstrates, by clear and convincing evidence, that the factual determinations adopted by the

court of appeals are unreasonable.

68. Given all the above, this Court should issue the writ requested, and grant the new trial.

WHEREFORE, it is respectfully requested that this Honorable Court take notice of the

above and grant the remedy requested.

I HEREBY CERTIFY that Friday, December 6, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to counsels of record.

Request for ...                                                                                          Page 25
Civil No. 20-1588 (WGY)

     In San Juan, Puerto Rico, this Friday, December 6, 2024.

***<u>S/ Juan F. Matos de Juan</u>***
Juan F. Matos de Juan
USDC-PR 207605
255 Ponce de Leon Ave, suite 1210
Hato Rey, Puerto Rico, 00917
Telephone: (787) 509-2335
E-Mail: matos@sgmr.net
