IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN CARLOS MELÉNDEZ-SERRANO,

    **Petitioner,**

           **v.**

ANA ESCOBAR-PABÓN, DOMINGO
EMANUELLI-HERNÁNDEZ and VÍCTOR
MALDONADO,

    **Respondents.**

**Civil No.** 20-1588 (FAB)

### OPINON AND ORDER

BESOSA, District Judge

    Before the Court is Petitioner Juan Carlos Meléndez-Serrano ("Meléndez")'s second amended petition for *habeas corpus* relief, filed pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254"). (Docket No. 47.)  For the reasons set forth below, the Court **GRANTS** Meléndez's section 2254 petition and orders a new trial.

### I.  Factual Background

    This *habeas corpus* petition pertains to the horrific murders of Haydée Teresa Maymí-Rodríguez ("Teresa") and her two children, Eduardo Enrique and Melissa Morales-Rodríguez ("Eduardito" and "Melissa," respectively).  (Docket No. 47 at p. 2.)  On February 24, 1992, a jury convicted Meléndez and Antonio Ramos-Cruz ("Ramos") of first-degree murder after a ten-day trial revealed,

*inter alia*, that the Puerto Rico Police Department failed to preserve critical evidence and contaminated the crime scene, the murder weapon abruptly appeared at Teresa's estranged husband's home months after the triple homicide, and two eyewitnesses recanted their initial statements to police following a nine-hour interview at the Department of Justice and threats of prosecution. The summary set forth below encapsulates the 2,236-page trial transcript, translated into English by the Commonwealth of Puerto Rico. (Docket No. 68, Exs. 1-11.)

### A.  Teresa's Strained Relationship with Eduardo Morales-Colberg

Teresa married Eduardo Morales-Colberg ("Morales") in 1984. (Docket No. 68, Ex. 2 at p. 209.) She was just 19 years old. (Docket No. 68, Ex. 3 at p. 154.) The couple subsequently had two children: Eduardito in 1984 and Melissa in 1986. (Docket No. 68, Ex. 2 at p. 209.) According to Morales, he used cocaine and occasionally smoked marijuana with Teresa. Id. at p. 251.

Morales, Teresa, and their children moved into a duplex in Lomas de Trujillo Alto in April, 1989. Id. at p. 126. "Like many married couples," Morales and Teresa "[had] problems." Id. at p. 125. He "was jealous and questioned [Teresa] when she went out." Id. at p. 124. In May 1989, the couple "separated." Id.

at p. 126.    Morales moved to his mother's house in Santurce, Puerto Rico.  Id. at p. 209.[1]

Teresa's first cousin, Nydia Magalie Agosto-Rodríguez ("Agosto"), testified that Teresa physically abused Morales, but that Morales "would not abuse [her]."  Id. at p. 124.  According to Agosto, "the true reasons for [Morales] and [Teresa's] separation [was] that she no longer loved him."  Id. at p. 185.  Morales testified that he separated from Teresa because "she wanted to be alone [. . .] to clarify her feelings."  Id. at p. 234.  In fact, two months before her murder, Teresa confided to Morales that "she had fallen out of love with [him]."  Id. at p. 236.  Morales testified, however, that he and Teresa "ended things on good terms, separated amicably, [and] had a good relationship."  Id. at p. 252.

Agosto alleged that a man named "Juanma el Prieto" ("Juanma") was "[Teresa's] friend, [and] that he wanted to help her, nothing more."  Id. at p. 183.  She previously disclosed to investigators, however, that Teresa and Juanma had an affair.  Id.  Agosto denied having made this statement.  Id.  The Friday before her murder, Teresa accompanied a man named "Javier" to his family's

---

[1] Carmen Rosa Colberg ("Colberg") is Morales' mother.  (Docket No. 68, Ex. 5 at p. 24.)

house in Aibonito, Puerto Rico.  Id.  They spent the night "at a party" there.  Id.

   **B.   The Trujillo Alto Residence**

      Teresa's duplex had three bedrooms and a bathroom on the second story.  Id. at p. 39.  The kitchen, living room, laundry room and a half-bathroom were downstairs.  Id.  Teresa slept on a mattress without a bedframe, surrounded by minimal furniture.  Id. at p. 40.  The front gate to the property was broken, "[having come] off its hinges completely."  Id. at p. 57.

      Visibility within the duplex was "quite poor" because the couple "had only installed one lamp in the kitchen [and another] in [Melissa's] room."  Id. at p. 42.  Teresa "asked her husband on several occasions [. . .] to install some lights [, but] he never did."  Id. at p. 118.  Agosto suspected that Morales "had not intervened [in repairing the house] to pressure [Teresa] to get back together."  Id. at p. 119.  Morales confirmed that the home "was missing a few things, some fixtures for the light bulbs."  Id. at p. 213.

      The house had two entrances, a front door leading to the living room and a back door opening into the kitchen.  Id. at p. 44.  Teresa lost the keys to the front gate of her duplex, requiring her to remove "slats" from the windows near the back door."  Id. at p. 54.  Once inside the kitchen, Teresa "would put

the slats back again." Id.  Morales ultimately provided Teresa with a duplicate set of keys.  Id. at p. 56.

### C. Monday June 25, 1989: Teresa's, Eduardito's, and Melissa's Last Day Alive

Morales claimed that he drove Melissa and Eduardito to his parents' home in his mother's car, a champagne-colored Toyota Corolla, on Friday, June 23, 1989.  Id. at pp. 67 and 214.  His blue Toyota Tercel was "in the shop for some repairs."  Id. at pp. 215 and 230. The children spent the weekend with their father and grandparents.  Id. at p. 67.  Teresa remained at her mother's house in Santurce, Puerto Rico.  Id. at p. 129.  She "didn't like staying at [her own] residence," a "dark" house with poor lighting.  Id. at pp. 68 and 129.

Teresa spent the day before her untimely death surrounded by family, including Agosto.  Id. at p. 36.  They were "like sisters," "always look[ing] after each other."  Id. at p. 38.  Teresa, her mother, Agosto, and other relatives attended a religious celebration on Sunday, June 25, 1989.  Id. at p. 67.  The attendees sang, enjoyed music provided by a church choir, and sunbathed at the beach.  Id. at p. 69.  Agosto and Teresa each consumed one beer.  Id. at p. 130.  Eduardito and Melissa did not attend because "[they] were with [Morales]."  Id. at p. 67.

At approximately 6:00 p.m., Agosto and Teresa drove to
a relative's home in the former's Honda Civic.  Id. at p. 69.  An
hour later, the cousins arrived at Peggy Sue, a disco located at
Stop 18 in Santurce, Puerto Rico.  Id. at p. 70.  For "around
fifty minutes," they "sat down on some small benches that were
outside [the entrance . . . because they didn't have any money]"
to pay the admission fee.  Id. at p. 70.  Teresa and Agosto then
drove to the Trujillo Alto duplex.  Id. at p. 71.  According to
Agosto, they arrived at Teresa's home at 8:45 p.m.  Id.  At this
time, "it was a bit dark," with a single light pole illuminating
the sidewalk in front of Teresa's house.  Id. at pp. 71-72.

Agosto "left the car running [and] talked to [Teresa]"
for a little while."  Id. at p. 71.  Teresa invited her to "come
in [for a visit]," but she declined.  Id. at p. 72.  Agosto
"noticed a couple of people outside, but [she] didn't look at any
of them."  Id. at p. 73.  Bárbara Martinez ("Bárbara"), "a girl
who [lived] around there whose [nickname] is Baby . . . came to
talk to [Teresa]."  Id.  Bárbara was a "close friend of [Teresa],"
a frequent house guest and companion.  Id. at p. 76.  Agosto then
told Teresa: "I'm leaving, call me tomorrow because I have to
go."  Id. at p. 77.

When Agosto returned home, she received a phone call
from Morales at approximately 9:05 p.m.  Id. at p. 78.  Morales

"asked [Agosto] where [Teresa] was, what [they] had done all day."
Id.  Agosto refrained from disclosing that she and Teresa "had
been to Peggy Sue," because "[she was] afraid of his reaction."
Id. at p. 136.  Morales informed Agosto that "[he was] heading
out [to take] the kids to [Teresa]."  Id.

        Morales testified that he arrived at Teresa's residence
"between 8:00, 8:30, 9:00 in the evening."  Id. at p. 213.  He
observed that Teresa "was outside talking" to Meléndez.  Id. at
p. 216.[2]  He "really didn't pay attention" to the immediate
vicinity, however, and could not recall whether "anybody else
[was] there."  Id.  Morales "said good evening [to Meléndez] and
proceeded to enter [the house] with [Teresa] and [their]
children."  Id. at p. 217.  Teresa, Morales, Eduardito, and
Melissa chatted in the living room for "approximately forty-five
minutes."  Id. at pp. 218-222.  Morales "hugged [Eduardito and
Melissa] tightly, kissed them, told them to take care of their
mom and to behave."  Id. at p. 222.  He then "went to [his]
mother's house," arriving at "around 10:00" at night.  Id. at
pp. 224 and 232.

---

[2] Meléndez lived in the house adjacent to Teresa within the same duplex.  (Docket No. 68, Ex. 2 at p. 262.)

**D. Wednesday June 28, 1989: Neighbors Discover Teresa's Corpse Inside the Upstairs Bathroom**

On June 28, 1989, Teresa's neighbors noticed that a noxious stench emanated from her house, raising concern among them. (Docket No. 68, Ex. 5 at p. 152.) Meléndez's father, Narciso Meléndez-Pérez ("Narciso"), called the Puerto Rico Police Department at "around 9:00 to 9:30" on Wednesday morning to report the odor. Id. at p. 152. Two police officers responded to the scene. (Docket No. 68, Ex. 8 at p. 79.)

Once the two police officers arrived, neighbors Luis Campos-Encarnación ("Campos") and Narciso "jumped over [Teresa's fence]," "open[ing] the gate" for law enforcement. Id. at pp. 77-80. The officers, Campos, and Narciso "looked at the doors," attempting to enter the residence. Id. at p. 81. Narciso "went out to fetch some knives . . . He gave [the knives] to the police so they could try to open the two doors." Id. The officers "were unable to open either of the doors," however, requiring the removal of "five window panes" from the kitchen window. Id. at p. 82. Campos entered first, followed by the officers and Narciso. Id. He then unlocked the front door, requesting that the officers "tell the prosecutor that [he] touched this door" in an abundance of caution. Id. at p. 82.

Campos instructed the officers to follow him upstairs. Id. at p. 83. The officers complied, walking behind Campos to the second floor. Id. He discovered Teresa in the bathtub, "[showing the officers] where the deceased was [located]." Id. at p. 84. Campos noted that there "wasn't any blood" on the hallway floor leading to the bathroom. Id. The officers entered Teresa's bedroom, turning off a TV and fan. Id. They then "went outside [because] the stench was too strong." Id.

Campos informed the officers that "they were missing two children and a dog . . . [They] turned around and went back upstairs. [The officers] opened the doors to the two [additional] bedrooms," but "didn't find anything." Id. at p. 85. Shortly after, a "bunch of officers arrived, and everyone started going in [the house]." Id.

**E.    Pandemonium at the Crime Scene**

Police Officer Dean Casillas-Feliciano ("Dean") received a note "indicating that a dead person had been found at Calle 2 in Lomas de Trujillo Alto." (Docket No. 68, Ex. 2 at p. 265.)[3] Because Dean "[performed] duties in that same area and it was about

---

[3] Dean Casillas-Feliciano lived on Calle 2 in Lomas de Trujillo Alto. (Docket No. 68, Ex. 2 at p. 260.) In 1989, he worked as a Puerto Rico State Police officer at the North Trujillo Alto Police Station in Covadonga. Id. at p. 261. Gregorio Casillas ("Gregorio") was also a police officer and lived on this same street. Id. at p. 262. Dean and Gregorio are not related, but share the same surname and are both police officers. Id. at 263.

the house where [he] lived," he "talked to the Sergeant to see if he would let [him] go by the place." Id. Dean arrived at Teresa's house at approximately 9:00 a.m., where he noticed several fellow officers from the precinct there and several onlookers." Id. at pp. 265 and 271. Officers lamented that "it was not possible to enter the site to see the person because [the] bad smell emanating from [a] decomposing body, well, was quite unpleasant." Id. at pp. 265-66.

Campos discussed the crime scene with Dean, providing him with a towel saturated "with some Vicks." Id. at p. 266. Dean placed the towel on his face," and "tried to go upstairs." Id. He encountered the "decomposing body of a woman in the bathroom," "sitting, leaning against the wall in the bathtub." Id. According to Dean, the woman wore a "sweater [that] was rolled up to [her] breasts, military green shorts [that] were unbuttoned," and pink underwear. (Docket No. 68, Ex. 2 at p. 269; Docket No. 68, Ex. 3 at p. 57.) The woman's face was swollen "with the tongue out, semi-bulging eyes." (Docket No. 68, Ex. 3 at p. 11.) A window above Teresa's body was closed, surrounded by a swarm of flies. (Docket No. 68, Ex. 2 at p. 270.) The "bathtub was clean," and the "bathroom had no blood." (Docket No. 68, Ex. 3 at pp. 10 and 58.)

Dean returned downstairs, and waited in the kitchen for reinforcements.  (Docket No. 68, Ex. 2 at p. 270.)  The kitchen contained "a big refrigerator," stove, and table.  (Docket No. 68, Ex. 3 at p. 16.)  The table was a "mess" with items that "were supposed to be in the fridge."  Id. at p. 19.

Lieutenant Jorge Rivera ("Rivera"), Prosecutor Carlos Juan Beltrán-Rodríguez ("Beltrán"), and a gaggle of homicide agents arrived an hour after Dean ventured upstairs, at approximately 11:30 a.m.  (Docket No. 68, Ex. 2 at p. 270.)[4] Beltrán inspected Teresa's body, observing that she sustained a stab wound in the center of her chest.  (Docket No. 68, Ex. 3 at p. 56.)  Dean followed Rivera inside the house and "started checking around the area, [trying] not to touch anything."  (Docket No. 68, Ex. 2 at p. 272.)  He "explained to the Lieutenant that two or three officers had entered, and that perhaps, well, they may have touched something [at the scene]."  Id. at p. 272.

Police officers discovered a blood-stained mattress, sheets, and a pillow on the floor of Teresa's bedroom.  (Docket No. 68, Ex. 3 at p. 1.)  They moved the mattress, pillow and sheets before photographs were taken.  Id. at p. 13.  "There was a lot of blood on the mattress," but not on the bedroom walls.  Id. at p. 5.

---

[4] Beltrán and Rivera led the investigation and were the highest-ranking law enforcement officers at the crime scene.  (Docket No. 68, Ex. 3 at pp. 58-59.)

According to Dean, "quite a bit of blood [appeared] as if [it] had gotten cleaned." Id. at p. 5.  The blood that remained at the scene "was already coagulated." Id. at p. 6.  The bedroom windows were ajar. Id. at p. 7.

The living room "wasn't in order but it wasn't messy." (Docket No. 68, Ex. 3 at p. 65.)  "A Budweiser beer bottle stood on a small table . . . There were bottles on the floor [and] a pack of cigarettes." Id.[5]  Police officers also discovered a marijuana cigarette. Id. at p. 78.

Dean notified homicide agents that he heard "rumors" regarding the location of Eduardito and Melissa, speculating that "it may have been the father who committed the crime and [had] taken the kids." (Docket No. 68, Ex. 2 at p. 272.)  Officers once more searched the bedrooms for Eduardito and Melissa. Id. at p. 272.

There were also "people [inside the house] that were not [law enforcement.  They were] nosy people." (Docket No. 68, Ex. 3 at p. 24.)  "Everyone did as they pleased." Id.  A neighbor searched the house for Teresa's dog while members of the press roamed freely. Id.  Beltrán "ordered everyone to leave . . . three or four times," but to no avail. Id. at pp. 60-61.  Members of

---

[5] Morales denied that he drank alcoholic beverages during his final visit to Teresa's house. (Docket No. 68, Ex. 2 at p. 245.)  He testified, however, that his favorite beer was Budweiser. Id.

the press, including reporters from Channel 11 and El Vocero
newspaper, entered Teresa's home, photographing the victims'
bodies at will. Id. at p. 62.

Rivera entered the kitchen, where he observed a small
lamp and items "that were supposed to be in the refrigerator [and]
some knives." (Docket No. 68, Ex. 1 at p. 109.) Because officers
"couldn't see anything" inside the kitchen, [Rivera] requested
that a "person from the press [. . .] turn on [a] spotlight so
that the guys could process what was on the table." Id. at p. 126.
Rivera held a knife in his hand, but did not examine it closely
because "the place was so packed with people from the press and
police officers who had nothing to do." Id. at p. 110. He learned
that officers located additional knives "outside" of the property.
Id. at p. 112. Rivera "didn't order them to be seized," however,
because "to [him] they didn't constitute evidence at the time."
Id.

Rivera ordered officers at the scene to seize "anything
that constituted evidence." Id. at p. 114. This testimony
suggests that individual officers possessed the discretion to
designate which items were subject to seizure. Rivera also
testified that he determined which knives were relevant to the
investigation. Id. at p. 123. If he "didn't see any blood [on a
knife], [he] didn't see anything that would link the knife to the

[victims]," so he "wasn't going to seize the knife." Id. at p. 23. Governing protocol mandated that Rivera review the evidence at police headquarters. Id. at p. 124. Rivera disregarded this protocol. Id. at p. 125. He did, however, excuse himself from the crime scene to speak with reporters in front of Teresa's house. Id. at p. 129.

Beltrán spoke with Dean inside Teresa's kitchen, "trying to piece things together to figure out how the crime [. . .] could have happened." (Docket No. 68, Ex. 3 at pp. 20.) Dean surmised that Teresa "must have been cleaning the refrigerator because the shelves of the refrigerator were outside [on the table]" with some meats and expired milk. Id. at pp. 20 and 22. He also noticed a pair of boys' shorts on the table, stained with blood and beneath a kitchen knife. Id. at pp. 22 and 30.

Beltrán ordered the shorts to be seized. Id. at p. 69. According to Dean, "it looked as if [the murderer] had cleaned that same knife with the pants and had left it there." Id. at p. 31. An officer "[took] the knife," however, "[lifted] it from the shorts [and] put it on top of the [sink] along with [other knives]." Id. at p. 31. This officer also moved the bloody shorts. Id.[6] Dean refrained from interfering with this violation

---

[6] At trial, Rivera could not recall finding a pair of children pants with blood. (Docket No. 68, Ex.1 at p. 115.) The Commonwealth then introduced a photograph of Rivera holding this article of clothing. Id. at p. 116.

Civil No. 20-1588 (FAB)                                          15

of crime scene protocol because of the then existing "discord between uniformed and non-uniformed police officers." Id. at p. 31.

At this juncture, Dean opened the freezer door and discovered a "frozen girl." Id. at p. 21. Beltrán "started running [and] told [Dean] not to touch the fridge." Id. at p. 21. Dean "told the district attorney, well, look, if the girl is in the freezer, the boy is a bit bigger, he must be in the bottom area since the shelves of the fridge are outside." Id. at p. 21. The exterior of the refrigerator contained no blood. Id. at p. 22. Beltrán "went up in a hurry to get Lieutenant Rivera." Id. at p. 21.

Rivera subsequently opened the bottom door of the refrigerator, "seeing the body of the boy." Id. at p. 26. He "immediately proceeded to take the boy out from the bottom of the fridge," placing Eduardito "on the floor in front of the sink." Id. at p. 26. Rivera then attempted to remove Melissa, but "the girl was stuck." Id. He succeeded in removing her from the freezer with Dean's assistance. Id. Rivera placed Melissa next to Eduardito. Id. "There was blood in both the freezer and bottom area" of the refrigerator. Id. at p. 28. "At a glance," Melissa had no wounds. Id. A layer of ice covered her body, however, preventing officers at the scene from conducting a more thorough

inspection.  Id.  Eduardito "had some perforations . . . in the area of the back."  Id.

In sum, Eduardito's and Melissa's bodies were discovered three hours after Dean arrived at Teresa's house.  Id. at p. 21. Dean "thought that if [he] hadn't opened the fridge by accident . . . people from the funeral home would have taken the murdered woman and they would not have found the bodies of the children." Id. at pp. 21-22.  He "found that there was no control of the scene."  Id. at p. 267.  "A lot of [uniformed and civilian-clothed] police officers got inside in a disorderly manner [and] they touched and messed a lot with the scene . . . [It] was not protected as it should have been protected."  Id.

### F.  Investigators Contaminate, Discard, and Destroy Critical Evidence

Beltrán ordered that the responding officers seize Teresa's blood-stained bedsheets for analysis.  (Docket No. 68, Ex. 3 at p. 58.)  He also ordered them to recover the knives in the kitchen, any of which may have been the murder weapon.  Id. at p. 64.  In fact, Beltrán witnessed "officers carrying two boxes containing photo albums [and] things that [he] thought were relevant."  Id. at p. 81.  These officers informed Beltrán that "everything [had] been collected."  Id.  "For whatever reason"

however, "the investigating officer[s] did not seize [the] knives." Id. at p. 83.

Beltrán and Rivera instructed Officer Frank Figueroa-Álvarez ("Figueroa") to treat the kitchen, living room, windows, and "any material that was polished in that location" for fingerprints. Id. at p. 27. He did not attempt to lift fingerprints from the location of Teresa's body, however, in part because "there were many officers there." Id. at p. 128. People were "touching everything and messing up the scene." Id. at p. 238. Only three police officers wore gloves. Id. at p. 239. Figueroa "wasn't able to lift any fragment with value" from Teresa's bedroom either, including from her TV, fan, and dresser. Id. Officers and members of the press who "had no business being [at the scene] . . . got in the way" of Figueroa's work. Id. at p. 236. They were "looking and prying" throughout the house. Id. No fingerprints were lifted from the children's bedrooms. Id. Beltrán ordered that the milk containers and items from inside the refrigerator be tested for fingerprints. (Docket No. 68, Ex. 1 at p. 107.) But, "[no] fingerprints were lifted from those containers." Id.

When Figueroa attempted to treat the downstairs half-bathroom for fingerprints, he "noticed that someone had already washed their hands there and flushed [the toilet]." (Docket

No. 68, Ex. 3 at p. 140.)  He observed that the water in the toilet
appeared "reddish [. . .] like blood."  Id. at p. 231.

Figueroa submitted fingerprint impressions from the
kitchen and living room.  Id.  Of the four impressions submitted
to the laboratory, only one had "comparative value."  Id. at
pp. 130-31.  Fingerprints from an ashtray located in the living
room belonged to Morales.  Id.  Figueroa advised his commanding
officers that the knives in the kitchen should be sent to the
laboratory to undergo a "proper [fingerprint] treatment," but his
suggestion was rebuffed and ignored.  Id. at p. 134.

**G.   Teresa's Family Encountered a Gruesome Crime Scene**

Teresa's family convened at the Trujillo Alto residence
at approximately 2:30 p.m., in disbelief that the twenty-four-
year-old mother and her two children were dead.  (Docket No. 68,
Ex. 2 at p. 84.)  The police "had already left" once they arrived
at the scene.  Id. at p. 93.  "All the neighbors were gathered
outside, [and] there were a lot of people [unknown to the family
who were] inside the house."  Id. at p. 85.

Agosto entered her cousin's home, observing blood in the
hallway and "in front of the kitchen door."  Id. at p. 86.  "All
the things that were inside the fridge" were removed and placed on
the kitchen table.  Id.  Agosto proceeded upstairs, observing that
Teresa's bedroom "was in the same condition that she had left it,"

with the exception "that the mattress was covered in blood, the
bedsheets were all covered in blood, the TV was on," and the walls
"were splattered with blood."  Id. at pp. 86-88.  The mattress
contained three distinct "blood stains," one large and two smaller
pools of blood on the fabric.  Id. at p. 87.

Agosto then walked to the bathroom.  Id. at p. 90.
Teresa's body had been removed, but certain "remains" lingered
inside the bathtub "all covered in blood."  Id.  "She had
decomposed there [. . .] there were parts of her there [with]
maggots."  Id.

Agosto entered Melissa's room, noting that "there was no
blood."  Id. at p. 91.  The girl's bedspread was "folded over the
mattress . . . [like when] kids hide under the bed."  Id.
Eduardito's bedroom appeared untouched and had no visible traces
of blood.  Id. at p. 92.  Agosto returned to the downstairs living
area, observing "blood draining down the [handrails]."  Id.  She
had "the impression that . . . blood had been cleaned from the
floors because [she] had seen very little blood on the floors
compared to what, what had obviously come out of the bodies."  Id.
at p. 170.  The hamper in the laundry room downstairs contained
blood-stained clothes, including underpants belonging to Eduardito
and a sweater.  Id. at p. 92.  Overwhelmed by grief, Agosto "closed
the door," left the unsupervised murder scene, and drove to the

Puerto Rico Institute of Forensic Sciences ("IFS"). Id. at p. 94. Teresa's father then physically attacked Morales, accusing him of killing his daughter. Id. at p. 246.

### H. The Causes of Death

Forensic pathologist Dr. Lydia Álvarez ("Álvarez") performed the autopsies of Teresa, Eduardito, and Melissa. (Docket No. 68, Ex. 3 at p. 144.) Dr. Álvarez did not testify at trial, however, because she subsequently left the IFS for a position at the University of Puerto Rico. Id. at p. 152. Her successor, Dr. Ofelia Vera ("Vera"), testified on behalf of the Commonwealth. Id.

According to Dr. Álvarez's report, Teresa sustained three knife wounds to the center of her thorax. Id. at p. 155. All three wounds "were located in the heart," puncturing her chest "from front to back, from right to left, and from the bottom up." Id. at pp. 156-57. These wounds caused Teresa's death. Id. at p. 157.

Teresa sustained defensive wounds on both hands. Id. at pp. 160 and 197. Id. Her body exhibited signs of decomposition, including protrusion of her eyeballs, distension of tissue, and detachment of her skin. Id. at p. 162. Her nasal cavity contained fly larvae. Id. at p. 163. Dr. Vera testified that Teresa's body exhibited a "decomposition of around three days, or over 48 hours."

Id. at. p. 170.  She emphasized that "decomposition is accelerated with heat."  Id. at p. 171.  Dr. Álvarez recovered pubic hairs from Teresa's underwear.  Id. at p. 246.  She did not test Teresa's clothing for the presence of semen.  Id. at p. 212.

Melissa sustained two stab wounds to her back.  Id. at p. 177.  These wounds were four inches deep, punctured her lungs, but "[would not] have caused death quickly."  Id. at pp. 178-79. She "could have survived" had a surgeon performed a lobectomy shortly after infliction of the knife wounds.  Id. at p. 179. Melissa's body displayed signs of decomposition, such as "greenish coloration in the abdominal area," "dilatation of superficial veins," and the presence of fly larvae in her scalp.  Id. at pp. 182-84.

Dr. Vera opined that Melissa's body decomposed for "about over 40 hours more or less."  Id. at p. 182.  She also testified, however, that "freezing stops [decomposition]."  Id. at p. 182.  If the murderer or an accomplice "put [Melissa's body in [the freezer] immediately" after death, discoloration of the abdominal area and dilatation of her veins "wouldn't have occurred."  Id. at p. 183.  Accordingly, Melissa's body was placed in the freezer approximately 40 hours after her death.  Id. at p. 202.  If Melissa died on Monday morning between 3:00 a.m. and 4:00 a.m., she would have been placed in the freezer "no earlier

than noon on Tuesday." Id. at p. 203.  Thus, the culprit or an accomplice returned to the scene of the crime to place Melissa in the freezer.

Eduardito sustained three stab wounds to his back and shoulders.  Id. at p. 184.  These wounds penetrated his heart, left lung, and pericardium.  Id. at p. 195. These injuries were fatal.  Id.  Dr. Vera testified that Melissa and Eduardito were both in the prone position at the time of their death.  Id. at p. 186.  She also stated that Eduardito "was placed in the refrigerator [. . .] much earlier than [Melissa]," likely "in the first few hours" after his murder.  Id. at p. 205.

Teresa, Eduardito, and Melissa were together during the murders based on the presence of the "mother's hairs [on] the bodies of the children."  Id. at p. 225.)  The children had no defensive wounds.  Id. at p. 198.

## I.    Thursday June 29, 1989: Family Members and the Puerto Rico Department of Health Sanitize the Crime Scene

The Puerto Rico Health Department contacted Teresa's mother after investigators abandoned the crime scene, informing her that "neighbors had complained about the bad smell." (Docket No. 68, Ex. 2 at p. 96.)  The authorities requested that the decedent's family "open the house" to fumigate the residence.  Id. Agosto and other relatives returned to Teresa's house on June 29,

1989.  Id. at p. 95.  She entered the duplex "like always" by removing slats from the kitchen window.  Id. at p. 96.

Employees from the Health Department "said that they weren't going to fumigate until [the family] cleaned it up." Id. at p. 97.  Teresa's mother objected, stating that it was "impossible for [them] to clean up this house."  Id. at p. 97. She called the Puerto Rico Police Department for guidance.  Id. For reasons beyond this Court's comprehension, investigators stated that "nothing else would be done in the house," and that "it could be cleaned."  Id. at p. 98.  Consequently, Teresa's family cleaned the crime scene.  Id.

They "hosed [Teresa's] room down" with water, "starting from the top" of the walls.  Id.  Initially, her family "didn't' know what to do with the mattress, which was all covered in blood." Id.  They ultimately "[threw] the mattress downstairs in order to burn it."  Id.  A neighbor helped them set this evidence ablaze in the front yard of the duplex.  Id. at p. 99.  Family members also burned "all the things that were covered in blood," including the bedsheets, the pillows, and the kids' clothes."  Id.  Agosto assisted in gathering the children's clothing from "all over the floor in the laundry room."  Id.  She also cleaned the refrigerator.  Id. at p. 100.  The Health Department then fumigated the house for "fifteen or twenty minutes."  Id. at p. 101.

### J. The Murder Weapon Appeared at Morales' House Months After the Murders of Teresa, Eduardito, and Melissa

Agosto and other relatives returned a week after the triple homicide to "get all of [Teresa's] things out of the house," concerned that "anyone could get [inside] because the gates were broken." Id. at p. 102. Morales' father and brother assisted Teresa's family in this endeavor. Id. at p. 103. They "picked up everything" and disassembled the beds. Id. "Everything [that the family] thought was useless was thrown away." Id. Teresa's personal effects and household goods were placed in cardboard boxes. Id. at p. 104.

Agosto washed the dishes, including an assortment of knives in "different sizes." Id. at p. 105. Morales' father and brother entered the kitchen, "[taking] it upon themselves to handle the heavy stuff." Id. at p. 107. Agosto placed three boxes containing Teresa's belongings in the trunk of her Honda Civic. (Docket No. 68, Ex. 1 at pp. 21 and 45.) The next week, she transferred the boxes to Morales, who then placed the boxes in his car. Id. at p. 21 and 30. Morales transported the boxes to his mother's house, where they remained for approximately five months because he "couldn't find the courage" to sort through Teresa's belongings. Id. at p. 22.

According to Colberg (Morales' mother), the boxes were "in [her] house for a few months." (Docket No. 68, Ex. 5 at p. 24.) She subsequently organized the boxes, placing "an ugly, broken, dirty knife" in a trash bag. Id. at p. 25. For an inexplicable reason, "[she] didn't like that knife and started to get nervous." Id. at p. 26. A "sixth sense" compelled Colberg to remove the knife from the trash bag. Id. at p. 36. She "decided to look at it more carefully, with a big magnifying glass," observing two hairs where "the blade joins the wooden handle." Id. at p. 26. Colberg "got scared" because she suspected that the knife "could be [the weapon with which her] two grandchildren and [her] son's wife had been killed." Id. at p. 26.

She placed the knife inside a plastic bag and showed her son. Id. at p. 28. Morales and Colberg concurred that the knife "could have been [the murder weapon]." Id. at p. 20. They first consulted an attorney, who advised them to contact the authorities. Id. at p. 30. A police officer retrieved the knife from Colberg's home. Id.

Dr. Vera analyzed the knife provided by Morales and his mother. (Docket No. 68, Ex. 3 at p. 186.) Technicians at the IFS stabbed a slab of pork meat with the knife to compare the lacerations with "photographs of the [victims] bodies." Id. at p. 186. Dr. Vera "found that there was a lot of similarity." Id.

at p. 186.  She concluded that "this weapon was compatible [. . .]
with what was used in the deaths."  Id. at p. 196.  "There is no
doubt" that Melissa and Eduardito were killed with the same weapon.
Id. at p. 197.  Because Teresa's "body had decomposed," Dr. Vera
could not conclude that she was killed with the same knife as her
children.  Id. at p. 197.

          Leida Rodríguez-Vélez ("Rodríguez-Vélez"), a medical
technologist at the IFS, compared Teresa's hair with the hair
embedded in the purported murder weapon.  (Docket No. 68, Ex. 6 at
p. 6.)  To conduct this analysis, Rodríguez-Vélez simply reviewed
hair strands "with the naked eye" under a microscope.  Id. at p. 8.
She claimed that the hair contained in the knife possessed
"microscopic characteristics similar to the control hair of the
victim Haydee Teresa Maymí-Rodríguez."  Id. at p. 13.

          Agosto did not specify whether she placed the purported
murder weapon inside the boxes she packaged at the Trujillo Alto
duplex, or whether she washed it in Teresa's kitchen sink after
the triple homicide.  (Docket No. 68, Ex. 2 at pp. 106-07.)  She
testified, however, that the knife belonged to Teresa but that
"the tip wasn't broken, nor was it missing so many pieces."  Id.
at p. 107.  Morales recognized the knife as belonging to "his
household," "but [that] the blade wasn't broken" before the
murders.  Id. at p. 227.  Dean testified that the knife submitted

by Morales "looks like the knife that was on the table" at the
crime scene, but did not recall "seeing it as broken as it was"
during the trial. (Docket No. 68, Ex. 3 at p. 33.)

**K.    Teresa's Neighbors State that They Heard a Woman Scream
       in "Anguish" and that a Child Yelled "Don't Hit Me" on
       the Night of the Murders, but No Suspects Emerge**

Less than a week after the bodies were discovered,
Beltrán "was transferred to Caguas to work there as a courtroom
district attorney." Id. at p. 80. Police Officer Pablo Quiñones-
Laboy ("Quiñones") joined the investigation in August 1989,
terminating Rivera and Police Officer Gerardo Román-Ayala
("Román")'s involvement in the case. Id. at pp. 244-45.

Before transferring to Caguas, Beltrán received
information suggesting that Teresa had a "romantic relationship"
with a former work colleague nicknamed "Juanma el Prieto." Id. at
p. 97. This man "[tried] to win her heart" by "sending her flowers"
and "inviting her out." Id. Narciso "scolded [Juanma] because he
had been honking the horn" late at night, waking the neighbors.
(Docket No. 68, Ex. 4 at p. 9.) This confrontation occurred on
Saturday June 24, 1989 at "1:00 or 2:00 in the morning." Id. at
p. 148.

Román located and interviewed Juan Manuel Pagán
("Pagán"), also known as "Juanma el Prieto." Id. at p. 9. Pagán
disclosed that "he previously visited [Teresa] at her residence

. . . in Cupey and that he had sex with her about two times." <u>Id.</u> at p. 150.   He also stated that he "could not have been the murderer" because he was "at his [mother's] residence sleeping with his girlfriend" on June 25, 1989. <u>Id.</u>  Police officers did not, however, verify Pagán's alibi. <u>Id.</u> at p. 157.

Meléndez informed investigators that at 10:00 p.m. on June 25, 1989, Teresa "came out yelling [. . .] that there was a man looking at her through the window, in the back area of the house." <u>Id.</u> at p. 7.   Teresa was "agitated," and the children "were crying." <u>Id.</u> at p. 66.  Meléndez "took steps to find out who had been looking at her," and told Teresa that "if something happened during the night, to move to the front bedroom [. . .] and to knock on the wall [so] his mother would be able to hear her." <u>Id.</u> at pp. 7 and 61.   Gregorio Casillas and his wife witnessed Teresa's reaction to the voyeur, corroborating Meléndez's statement. <u>Id.</u> at p. 65.[7]

Quiñones testified that he "spent two years looking for [the peeping tom]," but never found him. <u>Id.</u> at p. 76.  He also

---

[7] Steve Jiménez-García ("Jiménez") lived on Calle 2 in Trujillo Alto. (Docket No. 68, Ex. 9 at p. 7.)   On June 25, 1989, Jiménez heard Teresa scream at "around 10:40 at night" from his bedroom. <u>Id.</u> at p. 8.  She yelled "help, help . . . Ms. Lucy and Juan Carlos, there is a man watching me." <u>Id.</u> at p. 9. Jiménez's wife also heard Teresa's scream. <u>Id.</u>  On Monday morning, June 26, 1989, Jiménez witnessed Teresa "entering her house" at "7:30 AM in the morning." <u>Id.</u> at p. 10.   Jiménez contacted the police "about a month" after the murders, detailing the scream heard on Sunday night and the Monday morning sighting of Teresa: Investigators never interviewed him. <u>Id.</u> at pp. 25 and 29.

met with Román to "see what he had investigated." Id. at p. 245.
Quiñones quickly assessed that "there wasn't much physical
evidence recovered." Id. at p. 246. Quiñones presumed that
officers "worked on [the crime scene] inch by inch [to establish
a] solid foundation from the beginning." Id. This "solid
foundation" was, in fact, nothing more than an anemic inventory of
evidence. The police gathered the following objects from the crime
scene: "some photography albums of the family" and a clay mug.
(Docket No. 68, Ex. 3 at p. 346; Docket No. 68, Ex. 4 at p. 1.)
"No knives had been seized." Id. at p. 4.

     Ramonita Rivera-Colón ("Rivera-Colón") lived next door
to Teresa. (Docket No. 68, Ex. 5 at pp. 127-31.) At 4:00 a.m. on
Monday, June 27, 1989, Rivera-Colón heard a woman screaming "in
anguish." Id. at p. 133. She "went to the middle room [of her
duplex,] turned on the light and looked through the window" toward
Teresa's house. Id. at p. 135. She then heard "a child crying
and saying, 'don't hit me, don't hit me.'" Id. at p. 136. Rivera-
Colón dismissed this commotion, however, because "those kids" were
"in the habit of waking up at 4:00 in the morning screaming [and]
thought [Teresa] was scolding [them]." Id. She looked out her
front window, but "there was nobody" outside. Id. at p. 137.
After "about ten or fifteen minutes," Rivera-Colón "went back [to
bed]." Id. at p. 138.

Román informed Quiñones that a witness "[said] she had seen a purse on the roof of [Teresa's] house."  (Docket No. 68, Ex. 4 at p. 1.)  Quiñones borrowed a ladder from the fire department to retrieve the purse.  Id.  The trial transcripts do not indicate whether the purse contained any of Teresa's belongings.

Quiñones searched a warehouse maintained by the IFS in vain, perusing evidence "box by box, trying to find [. . .] the [bed]sheets that could be seen in the [crime scene] video and photos." Id. at p. 2.  He could only locate Teresa's pants, her shirt, and children's clothing with loose strands of hair.  Id. Subsequently, Quiñones requested that the Department of Justice exhume the victims' bodies to collect hair samples.  Id.[8]  The Department of Justice approved this request, exhuming Teresa, Eduardito, and Melissa from their gravesites in Bayamón, Puerto Rico to gather hair samples for comparison.  Id. at p. 3.

Quiñones first claimed that he read Román's notes "when [he] took over the investigation."  Id. at p. 124.  He then explained, however, that he "did not take into account what Román did" during his preliminary investigation.  Id. at p. 129. Quiñones admitted that he did not, in fact, read Román's investigative notes to determine if witnesses "repeated the same

[8] The record does not reflect whether Dr. Álvarez collected hair samples during the autopsies, which may have obviated the need to exhume the bodies.

version or gave him the same information." Id. at p. 164. Indeed, Quiñones "did not take [Román's notes] into consideration at any point." Id. at p. 166. By December 1989, investigators "still didn't have a suspect and [. . .] were interviewing [the] people who lived around the place of the events." (Docket No. 68, Ex. 5 at pp. 7-8).

### L. Two Eyewitnesses Recant Their Initial Statements to Police, Asserting that Meléndez and Ramos Attempted to Sexually Assault Teresa

Siblings José "Joíto" Martínez ("José") and Bárbara "Baby" Martínez ("Bárbara") adduced pivotal testimony at trial. In 1989, José and Bárbara were 17 and 15 years old, respectively. (Docket No. 68, Ex. 6 at pp. 76-80.)

Bárbara befriended Teresa on the day that "[the latter] moved to Lomas de Trujillo Alto." Id. at p. 252. They subsequently formed a "good, sound friendship." Id. at p. 216. Indeed, Teresa was "like a sister" to Bárbara. (Docket No. 68, Ex. 7 at p. 36.) Bárbara, José, and Meléndez visited Teresa's house "several times." (Docket No. 68, Ex. 6 at p. 216.) Bárbara and José "always [did] favors" for Teresa, including help with moving furniture. Id. at p. 79. Teresa "even left her kids" at the siblings' home on occasion. Id.

Initially, José and Bárbara denied having any knowledge of the murders. Id. at p. 122. In a television interview with

Channel 11, Bárbara stated that she "had been with the deceased until 10:30 PM, had left, and knew nothing else about the case." Id. at pp. 249-50.  Quiñones and Rodríguez nevertheless interviewed Bárbara "countless times."  (Docket No. 68, Ex. 4 at p. 215.) Bárbara signed a sworn statement "every time" she spoke with Rodríguez.  (Docket No. 68, Ex. 6 at p. 252.)[9]

"Despite [Bárbara] telling [the] investigators [that she] did not know anything about the case, they would come and [get] her at [her] house" and at school.  Id. at p. 2.  Bárbara requested assistance from the Legal Aid Office in Carolina, Puerto Rico.  Id. at p. 5.

On December 15, 1990, Bárbara "completely changed [her] version of the facts."  Id. at p. 6.  The day before, police officers escorted Bárbara and her mother to the Department of Justice at 10:00 a.m.  Id. at p. 7.  Bárbara repeated the "same thing," reiterating that she "did not know anything about the case."  Id. at p. 8.  The interview continued for nine hours, however, until Bárbara's account of that fateful night diverged from her previous statements to police.  Id.  It was around "10:00 at night" that she "started spilling the truth, because [Rodríguez] had called [her] brother [José]. . . and at that point [she] was

---

[9] Rodríguez testified that he interviewed Bárbara "about two or three additional times."  (Docket No. 68, Ex. 8 at p. 68.)  In contrast to Bárbara's testimony, Rodríguez claimed that he "only recorded the August 1989 interview."  Id.

afraid." Id.  After "hours of being at the Justice Department,"
Bárbara felt "exhausted," "nervous," and "afraid."  Id. at p. 9.
Rodríguez Mirandized Bárbara, suggesting that the police intended
to charge her with a criminal offense.  Id. at p. 40.  Bárbara
then signed a sworn statement at approximately 1:30 a.m. on
December 15, 1990.  Id. at p. 123.

José experienced an identical epiphany.  He arrived at
the Department of Justice on December 14, 1990 at 3:00 p.m. to
meet with Rodríguez.  Id.  José signed a sworn statement nearly 11
hours later at 1:30 a.m. on December 15, 1990.  Id. at p. 123.
Before signing his statement, police officers read José his Miranda
rights, informing him that he was "suspected of a crime."  Id. at
p. 126.  Rodríguez interviewed José with Bárbara in the room, a
decision that would have permitted the siblings to coordinate the
submission of consistent statements.  Id. at p. 123.  The following
narratives summarize José and Bárbara's trial testimony.

### 1.   Bárbara's Trial Testimony

According to Bárbara, Teresa and Agosto arrived at
the Trujillo Alto residence at 7:00 p.m. on Sunday June 25, 1989.
(Docket No. 68, Ex. 6 at p. 219.)  Bárbara testified that she
greeted Teresa, then "went inside the house with her."  Id. at
p. 220.  Teresa requested that Bárbara "accompany [her] to buy

bread and milk" at a bakery located fifteen minutes away from the duplex.  Id.

Once they returned from the bakery, Bárbara alleged that Teresa "asked [her] to accompany her to make a telephone call to a so-called 'Prieto.'"  Id. at p. 221.  Teresa and Bárbara walked to a payphone, called Prieto, but he didn't answer.  Id. After, they went "back to [Teresa's] house," where Bárbara "stood at the [bathroom] door" while Teresa took a shower.  Id. at p. 222. Bárbara could not, however, recall the topic of their conversation that night.  Id.

Bárbara walked home because her mother "asked [her] to buy cigarettes."  Id.  The then fifteen-year old "went to the store" to purchase the requested item.  Id.  Instead of delivering the cigarettes to her mother, Bárbara "saw [Meléndez] talking to [Teresa, and] stayed with them."  Id. at p. 223.  "A little while later, [Teresa's] husband arrived" with the children.  Id. at p. 225.  Meléndez allegedly crossed the street to speak with Ramos. Id. at p. 226.  Bárbara then "crossed over to where [Ramos] and [Meléndez] were."  Id.  Morales, Teresa, and their children entered the duplex.  Id. at p. 227.[10]

---

[10] Rodríguez and Quiñones interviewed Bárbara on August 28, 1989. (Docket No. 68, Ex. 7 at p. 27.)  She informed them that her mother "called [her] at 10:30 at night."  Id. at p. 28.  In fact, Barbara's mother confirmed that she called Barbara at this time.  Id.  At trial, Barbara testified that she "was lying," however, and that her mother "was mistaken."  Id.

Bárbara maintained that Meléndez "asked [her] to take [Teresa's house] keys" to have "an excuse to talk to her." Id. at p. 227. She also testified, however, that Meléndez frequently visited Teresa at her home for social gatherings. Id. at p. 216. The trial transcripts do not reveal why Meléndez required an "excuse" to speak with Teresa. Bárbara agreed to steal from her "close friend," a woman she embraced as a "sister." Id.

Bárbara "went up to [Teresa's] house for a moment [and] took the keys." Id. at p. 228. Neither Morales, Teresa, nor the children observed Bárbara enter or exit the house. Id. at p. 230. She then "went to where [Ramos] and [Meléndez] were and stayed with them." Id. Bárbara did not, however, transfer the keys to Meléndez. Id. at p. 228.

"A little while later, [Teresa's] husband left." Id. at p. 230. Bárbara returned to Teresa's house and "stayed talking to [her] at the gate." Id. at p. 230. Meléndez and Ramos remained under a light pole across the street. Id. at p. 231. Teenage boys from the neighborhood (José, Armando, Gaby and Luis) joined Meléndez and Ramos. Id. at p. 231. Armando and José walked across the street to chat with Bárbara and Teresa. Id. Teresa

"[told them] that she was at a dance club [and] that she drank a lot."[11]

"Everyone left" the vicinity except for Ramos, Meléndez, Bárbara, and Teresa. Id. at p. 232. Bárbara testified that she "stayed talking to [Teresa] alone" on the sidewalk. Id. at p. 233. Meléndez and Ramos "were still at the light pole." Id. Teresa's children remained inside the house. Id. "At around 2:00 to 2:30 in the morning, [José] came out to get [Bárbara]." Id. In sum, Bárbara remained in front of Teresa's house for 3.5 hours while Meléndez and Ramos congregated near the adjacent light pole.

Bárbara returned home with Teresa's keys, but Ramos, Meléndez, José, and Teresa remained on the street. Id. at p. 235. Bárbara went to bed, but "a little while later [her] brother came to get [Teresa's] keys" and left. Id. She "stayed curious about what the three of them were doing alone with [Teresa] at the house," somehow cognizant that Ramos, Meléndez, and José were still with Teresa even after Bárbara left the area. Id.

---

[11] Bárbara contradicted Agosto's testimony in at least two respects. First, Agosto testified that she and Teresa arrived at the Trujillo Alto duplex at 8:45 p.m. (Docket No. 68, Ex. 2 at p. 71.) Bárbara asserted that Teresa arrived at 7:00 p.m., affording ample time for them to visit the bakery, walk to a payphone, and for Teresa to shower all before Morales arrived with the children. Second, Agosto testified that Teresa consumed just "one beer." Id. at p. 130. Teresa purportedly informed Bárbara, however, that "she drank a lot" that day. (Docket No. 68, Ex. 6 at p. 231.)

Bárbara could not recall "how much time transpired from when she left to [her house] until [José] went to pick up the keys." Id. She left her bedroom, "went up to [Teresa's] house, went inside through the kitchen, and [went] upstairs right up against the wall, up to the last step." Id. Again, Bárbara was "curious . . . because there were three men and only one woman, and she was alone." Id. at p. 236. The record does not reflect whether Bárbara witnessed the three men enter Teresa's house, or how Bárbara learned that Meléndez and Ramos were inside the residence. She somehow knew, however, that three men were inside her friend's home, a circumstance that sparked her curiosity. Id.

At the top of the stairs, Bárbara witnessed Meléndez "hitting [Teresa]" while "[Ramos leaned] against the door frame." Id. at p. 237. In fact, Meléndez and Teresa "were hitting one another . . . both of them . . . You know, he would hit her and she would strike back." Id. at p. 239. Bárbara could not recall "where the children were at the time [she] saw [Meléndez] hitting Ms. Teresa." Id. at p. 244. She then fled after "several seconds." (Docket No. 68, Ex. 6 at p. 240; Docket No. 68, Ex. 7 at p. 11.)[12] According to Bárbara, Teresa "was not screaming" during the assault. (Docket No. 68, Ex. 7 at p. 35.) In fact,

---

[12] During cross-examination, Bárbara testified that she only "peered in for a few seconds and left." (Docket No. 68, Ex. 7 at p. 35.)

Bárbara "didn't hear [Teresa]" at all, despite participating in a physical altercation.  Id.

Bárbara did not intervene or "tell [Meléndez] not to continue hitting her."  Id. at p. 10.  "While coming down the stairs [she] saw [her] brother with his back turned to the staircase, [she] grabbed him by his left arm and told him . . . 'Let's go, Joíto; this doesn't involve us.'"  (Docket No. 68, Ex. 6 at pp. 240-41.)  Once Bárbara returned home, she "slept very well." (Docket No. 68, Ex. 7 at p. 32.)

The morning after the purported assault, Ramos allegedly "told [her] to find out if [Teresa] was [at home]. [She] went up to [Teresa's] house, looked inside, [but] the windows were closed.  [Bárbara] went down and told [Ramos] that [Teresa] was not there."  (Docket No. 68, Ex. 6 at p. 241.)  The following day, Bárbara again "ran into Ramos," who asked her "to find out if [Teresa was home]."  Id. at p. 242.  Bárbara "went to [Teresa's] house [. . .] but she was not there."  Id.  She inferred that Teresa was not home "because the windows were closed."  Id.

Bárbara refrained from entering Teresa's house in stark contrast to her behavior the day before.  She had barged into Teresa's house twice to steal the keys and to satisfy her "curiosity" regarding the presence of three men inside her "friend's" home.  She would not, however, enter the house to

confirm whether Teresa or the children required assistance after the physical altercation with Meléndez. Bárbara subsequently learned that "they had found [Teresa] dead." Id. at p. 243. She "didn't see Meléndez again." Id.[13]

During cross-examination, Bárbara insisted that she "did not lie, [she] omitted" information because her brother "was one of the three who had stayed there with [Teresa] that night." Id. at p. 247. In a sworn statement, Bárbara averred that she had known Ramos for three years and that she was his "girlfriend." (Docket No. 68, Ex. 7 at p. 56.) At trial, Barbara testified that "as far as [she] understood, [she] was" in a romantic relationship with Ramos. Id. at p. 57. She then conceded, however, that this belief was incorrect. Id. at p. 56.

### 2. José's Trial Testimony

José played basketball with "guys" from the neighborhood on June 25, 1989. (Docket No. 68, Ex. 6 at p. 84.) He left the basketball court at approximately 10:00 p.m. to meet his sister and Teresa in front of the latter's house. Id. According to José, Meléndez, Ramos, "Fredito," "Gaby," "Armando,"

---

[13] José testified, however, that he ended his friendship with Meléndez because of a dispute with Bárbara regarding videotapes. (Docket No. 68, Ex. 6 at p. 187.) Consequently, José's testimony suggests that Bárbara did, in fact, "see" Meléndez after the triple homicide.

and "Otto" were also present.  Id.  Everyone "stayed talking for a while" on the sidewalk.  Id.

José and the other teenagers "were interested in watching" a championship basketball game at 10:30 p.m.  Id. at p. 86.  Armando, Gaby, José, and Fredito then left the sidewalk, returning to their respective homes to watch the game.  Id.  José testified that Bárbara, Teresa, Ramos, and Meléndez "stayed in front of the house, having a conversation."  Id. at p. 87.

After José watched the basketball game, his mother "told [him] to go get [his] sister" from Teresa's house at "1:00 or 1:30 AM."  Id. at p. 90.  According to José, Meléndez and Ramos were near a light pole in front of Teresa's house.  Id.  He testified that at this time "there weren't any people on the street.  Everything was shut off."  Id.

José called Bárbara's name from the street, alerting his sister that "Mom is calling you to go home."  Id.  Bárbara "came out of [Teresa's house]."  Id.  She walked home by herself in the dark while José remained on the sidewalk with Meléndez and Ramos "[making] small talk."  Id. at pp. 91-92.  They then "started talking about Teresa," and how "she was really hot."  Id. at p. 92.

José testified that Meléndez "[joked] about how to get with [Teresa] and to put it in her."  Id.  He laughed "since

[they] were joking" and "didn't take it seriously." Id. at p. 93.
They also talked "[about] how to get inside the house." Id.
Perhaps they would manufacture "some excuse" to gain access. Id.
at p. 94.  At approximately 2:30 a.m., "Teresa came outside" and
called José's name. Id. at pp. 94-95.  Teresa allegedly requested
José to "get [his] sister" because Bárbara "took [her] keys." Id.
at p. 95.  José returned home, telling Bárbara "Baby, give me the
keys, Teresa is asking [for them]." Id.  Bárbara handed Teresa's
keys to José. Id.

        José returned to Teresa's house. Id. at p. 96.  He
greeted Teresa "in the front of [her] house" and "gave her the
keys." Id.[14]  José observed that Meléndez and Ramos were still
"at the light pole." Id. at p. 97.  Meléndez and Ramos then walked
to José and Teresa to ask for some water. Id.  José heard "one of
them" say that "this is the opportunity . . . to deal with her."
Id.  José said, "No, no, no, I am not going to be doing that; I am
not going to be in the plot." Id.  Meléndez insulted José, stating
"You sissy; fuck off." Id.  José "ignored them and left." Id. at

---

[14] At trial, Bárbara alleged that "no one" knew who seized Teresa's keys. (Docket
No. 68, Ex. 7 at p. 1.)  Defense counsel questioned, "[how] was it possible
[then] that your brother went to your house and told you, 'Give me the keys,
[Teresa] sent for them?'" Id.  Bárbara hypothesized that "maybe [Teresa]
noticed the keys were not there and . . . since I was always the one who was
always there, sometimes I had her keys." Id.

pp. 97 and 114.[15]  He returned home, leaving Teresa alone in the
dark of night with two men lingering outside her home, plotting to
do her harm.  Id.

When José returned home, "he [thought] about what
[Meléndez and Ramos] told [him], although since [he] was getting
to know them, [he] didn't think they were going to do something
like that, but either way [he] left [his] house and" returned to
Teresa's duplex.  Id. at p. 98.  José "didn't find them outside"
on the street.  Id.  He entered Teresa's house.  Id. at p. 100.
"[There] was no light on the ground floor . . . At that time [José]
went up" the stairs.  Id. at p. 99.  José testified that he observed
Ramos "leaning against the wall" next to Teresa's bedroom.  Id. at
p. 100.  He heard "some voices" that may have belonged to Meléndez
and Teresa.  Id. at p. 104.  Teresa allegedly told Meléndez "Juan
Carlos, go, it's late; we can talk later if you want."  Id.  But,
Meléndez "didn't want to budge; he wanted to talk about another
issue, which, which wasn't even important to him, but the voices
became agitated."  Id.  The voices "would get louder, softer . . .
[at one point] they were very loud . . . arguing."

José then went downstairs, sat on the living room
sofa, and "[tried] to better understand . . . why [Ramos and

---

[15] During cross-examination, José stated that he spoke with Meléndez and Ramos
for twenty minutes after returning the stolen keys to Teresa.  (Docket No. 68,
Ex. 6 at p. 146.)

Meléndez] were there [. . .] arguing," as if they had not made their intentions known earlier that night.  Id. at p. 105.  As José was "thinking about why they were arguing," Teresa remained upstairs and outnumbered by two men.  Id.  José sat still for no "more than ten minutes" in the living room as Teresa fended for herself.

"At one point in time [Bárbara] showed up."  Id. at p. 1-7.  She "grabbed [José] by [his] left arm and told [him], 'let's go [. . .] I don't like what's going on here.'"  Id.  Bárbara and José departed from Teresa's house at "about 3:30 to 4:00 AM." Id. at p. 107.

José "did not intervene" because he was "afraid" to defend Teresa.  Id. at p. 173.[16]  He assumed that Meléndez and Ramos planned "only to rape [her]."  Id. at p. 192.  His "attitude would not be the same" had he known that they intended to murder Teresa and her children.  Id.  José earnestly believed that they "were there only to have a good time with her."  Id.

He "decided to look over at [Teresa's] house [on Monday], but the windows were half-opened, and everything was closed."  Id. at pp. 108-09.  José also encountered Meléndez, and asked "whether he had seen [Teresa]."  Id. at p. 110.  Meléndez

---

[16] José testified that he once "hit [his] stepfather with a pipe" to defend his mother.  (Docket No. 68, Ex. 6 at p. 175.)  José mustered the "courage" to protect his mother, but not Teresa on the night of her murder.  Id.

allegedly answered, "Oh, well, then she must have left with the kids."  Id.  On Tuesday, Ramos told José that "he didn't know anything either."  Id.

José "continued [his] friendship with [Meléndez] for some time after" Teresa, Eduardito, and Melissa were murdered. Id. at p. 171.  The plot to sexually assault Teresa and the triple homicide did not deter José from continuing his friendship with Meléndez.  A subsequent "problem with [Bárbara] regarding some videotapes," however, "broke" José's friendship with [him]."  Id. at p. 187.

**M. Investigators Test for the Presence of Semen Years After the Murders**

The chain of custody regarding Teresa's underwear is fraught with ambiguity and a lack of documentation.  Beltrán testified that he discovered Teresa inside the upstairs bathtub, "wearing pink panties."  (Docket No. 68, Ex. 3 at p. 57.) Pathologist Dr. Ofelia Vera asserted that "hairs were taken from [Teresa's] panties," establishing that the IFS assumed custody of this evidence.  Id. at p. 221.  Defense counsel questioned Dr. Vera whether "as far as [she knew], in this pathological test performed on [Teresa], did they look for semen?"  Id. at p. 212.  Dr. Vera answered, "No."  Id.  Accordingly, pathologists completed Teresa's autopsy without testing for the presence of semen on her clothing.

The IFS only tested Teresa's underwear for semen on March 21, 1991, two years after the triple homicide and three months after the Martínez siblings had implicated José and Meléndez in the murders.  (Docket No. 68, Ex. 6 at p. 20.)  Medical technologist Leida Rodríguez-Vélez testified that the IFS received Teresa's underwear from "Officer Pablo Quiñones" on March 21, 1991. Id. at p. 21.  When asked if she "[knew] where [the underwear] came from," Rodríguez-Vélez answered "No."  Id. at p. 20.  Why would Quiñones submit Teresa's underwear to the IFS if pathologists received this evidence after the murders?  For reasons not apparent in the trial transcripts, Quiñones assumed custody of Teresa's underwear at some point after the autopsies, or retained possession of this evidence from the inception of his investigation.

Rodríguez-Vélez had no knowledge of the conditions in which Quiñones stored this evidence.  Id.  She testified, however, that biological fluid such as semen must be preserved in a "low temperature" and "dry environment" because "moisture and heat" destroy biological fluid.  Id.  According to Rodríguez-Vélez, there "was an absence of semen" on Teresa's shorts, underwear, and sweater.  Id. at p. 18.

### N. Meléndez's Coworker Testified on Behalf of the Commonwealth

Meléndez worked with Juan Enrique Ferreiro-Flores ("Ferreiro") at Island Security. (Docket No. 68, Ex. 5 at p. 41.) According to Ferreiro, Meléndez arrived to work on Monday, June 26, 1989 from "10:00 to 10:30 in the morning." Id. at p. 52. Ferreiro signed-in for Meléndez at 6:00 a.m., however, "to cover for him." Id. at p. 53.

Ferreiro testified that Meléndez showed him a newspaper shortly after the triple homicide, stating "look, this happened next to my house." Id. at p. 43. Meléndez mentioned that he and Teresa had "some kind of friendship," and that he would visit her house. Id. He also informed Ferreiro that investigators "might find [his] fingerprints there . . . because [he] used to sit at [Teresa's] table." Id. at p. 44. Meléndez appeared "very worried." Id. at p. 46.

Ferreiro observed a scratch on Meléndez's neck and chest area "four or five days" after the murders. Id. at pp. 46-48. He fabricated a news report, notifying Meléndez that the authorities were "going to investigate" the skin under Teresa's nails "to see how [Meléndez] reacted." Id. Meléndez responded that he "hadn't

watched the news," but appeared "a bit scared" to Ferreiro.  Id. at p. 50.[17]

###    O.    **Ramos Raised an Alibi Defense at Trial**

Ramos mounted an alibi defense, contending that he "was at his residence [at the time of the murders]; therefore, he could not have been at [Teresa's] residence."  (Docket No. 68, Ex. 8 at p. 32.)  His aunt, Margarita Cruz ("Cruz"), testified that Ramos arrived home "from 9:30 to 10:00 at night" on June 25, 1989.  Id. at p. 37.  She observed Ramos asleep in his room Monday at "around 3:00 in the morning."  Id. at p. 38.  Cruz had a "habit of waking up at that time [to check] on [her son who] suffered from seizures."  Id.

Cruz also alleged that Eduardito and Melissa visited her house between 9:00 and 9:30 p.m. on June 25, 1989.  Id. at p. 56. Teresa's children "play[ed] with [her] nephews."  Id. at p. 57. At "around 10:00 [at night] . . . they left, because their mom called them."  Id.

---

[17] Rodríguez rested on behalf on the Commonwealth on February 20, 1990.  (Docket No. 68, Ex. 7 at p. 176.)  The Court denied Ramos' motion for summary dismissal, holding that "the evidence that the prosecutor has provided, if the Jury were to believe it, would tend to show that the presence of the defendants in the deceased's bedroom was directed at consummating the result of the conspiracy, which was consummating the carnal act with the deceased."  Id. at p. 13.

### P. Eyewitness Testimony Identified Morales as an Alternative Suspect

Damaris García-Ramos ("García") lived near Teresa on Calle 2 in Trujillo Alto. Id. at p. 124. She returned home on June 25, 1989 at 11:00 p.m. Id. at p. 125. García observed Morales' car parked near her home. Id. The blue Toyota Tercel had a "dent in the front." Id.[18] According to García, she was familiar with Morales' car and had seen it "several times." Id. During cross-examination, Rodríguez elicited testimony revealing that Ramos' "dad is a cousin of [García's] grandfather." Id. at p. 135. García stated, however, that she did not "have a deep friendship" with Ramos. Id.

Eluzmindrina Feliciano-González ("Feliciano") lived next door to Teresa. Id. at p. 145.[19] On Tuesday, June 27, 1989 (the day before neighbors and police discovered the bodies), Feliciano chatted with Bárbara and José's mother "in front of [her] house on the sidewalk." Id. at p. 148. At approximately 6:00 p.m.

---

[18] Frank Álvarez-Navaro ("Álvarez") operated a mechanic shop in Villa Palmeras, Puerto Rico. (Docket No. 68, Ex. 7 at p. 105.) Álvarez knew Morales "as a client" for "over 20 years." Id. In fact, throughout the years Álvarez also repaired cars belonging to Morales' father and grandfather. Id. at p. 109. When Álvarez "read the news about the problem with the children," Morales' blue Toyota Tercel "had been inside [his] place of business for about a week or longer." Id. at p. 107. "About a week after" the murders, Morales' brother retrieved the car from his shop. Id. at p. 108. Álvarez did not maintain "any written evidence" or logbook regarding Morales' car, and could not specify the "exact date[s]" he performed the repairs. Id. at p. 109.

[19] Feliciano is also Dean Casillas' mother. (Docket No. 68, Ex. 8 at p. 145.)

when it was "still daylight," Feliciano "looked up and [saw] that from the deceased's house, someone jumped over the gate to the street, to the sidewalk . . . When [she] saw that individual jump, [he] went and opened [their car door], [she] saw the [person's] profile." Id. at p. 150. Feliciano implored her neighbor, "look, that man, look at what I'm seeing jumping over [Teresa's] fence." Id. She inferred that the man "[had] to be the young woman's husband, because [she had] been told that he [was] always arguing with her, as they are separated." Id. The man entered a blue car, "turned upward and went in reverse and left." Id. at p. 151. The car "was dented on the front driver's side." Id.

The next day, Feliciano informed her son that she witnessed an "individual jump over the fence and all that, but that [she] didn't know who it was." Id. at p. 153. Beltrán subsequently interviewed Feliciano in front of Teresa's house. Id. Feliciano again "[provided] all the details of the individual [she] saw jumping" from Teresa's property. Id. at p 154. Investigators later informed Feliciano that they located Morales' vehicle, and inquired whether she "could go identify the car."

Id. at p. 155.  Investigators did not, however, "do anything else"
regarding identification of the vehicle.  Id.[20]

        At a preliminary hearing regarding the reduction of
bail, Feliciano and other witnesses gathered at the courthouse.
Id. at p. 156.  As she left court, Feliciano "saw the individual
[who jumped over Teresa's fence]."  Id. at p. 157.  That individual
was Morales.  Id.

        The jury visited "the Lomas de Trujillo Alto
subdivision" to view the location where Feliciano allegedly
witnessed Morales jump over Teresa's fence.  (Docket No. 68, Ex. 10
at p. 149.)  The Court and the parties "[used] three different
people [to] jump the fence . . . simulating part of the testimony
of Ms. Eluzmindrina Feliciano and, to such effect, [they] located
a person from the neighborhood and [used] two of the bailiffs
[. . .] who worked at some point with the ladies and gentlemen of
the jury."  (Docket No. 68, Ex. 11 at p. 8.)

        Q.  **Closing Arguments**

        Although no physical evidence established that Teresa
experienced a sexual assault, rape as the motive for murder
permeated the trial.  José's testimony was unequivocal:  Meléndez

---

[20] Feliciano testified that she observed this incident from a distance of "ten
residences" for a total of five seconds.  (Docket No. 68, Ex. 9 at pp. 78
and 93.)  She persisted, however, that Morales was "identical" to the man who
she observed jumping over Teresa's fence.  Id. at p. 127.

and Ramos intended to "get with [Teresa] and put it in her."
(Docket No. 68, Ex. 6 at p. 92.)   The prosecution and defense
counsel addressed the rape allegations in their final summations.
Excerpts of the closing arguments are set forth below.

Rodriguez's Closing Argument:

Ladies and gentlemen of the jury, two young people
appeared here, Barbara was 14 years old at the time, and
they told you about an event that will never be erased
from their lives, an event that, in Barbara's own words,
"Let's go away from here, Joito," referring to her
brother, "I don't like what's happening." An event that
demonstrates the participation of these two men, who,
taking advantage of the small house, planned, "Let's
have sexual intercourse with her," because she was a
pretty woman, she was an attractive woman, as her husband
said, she was a real woman, I like her.     The
irrepressible desire to have sexual intercourse with
that woman caused her death and it caused her death
because she defended her honor [. . .] she did not give
in to the intentions of these two men [. . . ] The final
outcome is Teresa's refusal to not let herself be raped
and she marked it for Juan Carlos' posterity [. . .] .
I'm telling you, ladies and gentlemen of the jury, that
the evidence presented here before you by the state, the
prosecution, without a doubt, establishes a plan for the
conspiracy to have sexual intercourse with Teresa, Juan
Carlos' participation, Antonio's participation in the
vile murder of them committed against two children and
a woman and to later start to spin a series of lies.

(Docket No. 68, Ex. 11 at pp. 9-20.)  Alvarado's Closing Argument:

A mirage has been created here, an illusion, a lie, a
big lie, and what's that big illusion and big lie? That
these young men went in there to have a good time, to
rape this young woman, and why say that?  First, they
insinuated it and, later, they said it. Why? An analysis
easily establishes that there's the only thing they
could invent, because she wasn't rich, she didn't have
jewelry, she didn't have anything, and you have to invent

a motive for the murder, this, the motive of having
sexual intercourse, raping her.  But, what does the
evidence there, they physical, concrete evidence there,
and the scientific evidence of the pathologist say to
us, once again, what does it say, once again, to you,
ladies of gentlemen of the jury?  You saw the photo, you
saw the tapes, Ms. Haydee Teresa Maymi was completely
dressed, she had her clothing, she had her underwear, it
wasn't torn, it wasn't destroyed, where's the attempt,
where's the rape?  Furthermore, her body was examined,
her clothing, excuse me, and semen was found there and
a test was not done to determine if there was semen in
her body, God knows why.  But all the physical and
scientific signs indicate that that woman wasn't
attacked, with the intention of raping her.

Id. at pp. 34-35.

## II.  The 1992 Guilty Verdict and Post-Conviction Litigation

The jury returned a guilty verdict on April 10, 1992.  (Docket
No. 47 at p. 7.)  Meléndez is currently serving the first of three
consecutive ninety-nine year terms of imprisonment for the murders
of Teresa, Eduardito, and Melissa.  Id.

Meléndez and Ramos subsequently filed direct appeals.  Id.
The Puerto Rico Court of Appeals affirmed their convictions on
January 26, 1999, holding that "there was enough evidence for a
jury to [infer] that all of the elements of murder in the first
degree were present, and to connect the defendants to the crime."
El Pueblo de P.R. v. Cruz, Case No. KLCE201701397, 2019 WL 2232528,
at *3 (P.R. Cir. Mar. 13, 2019) (Docket No. 68, Ex. 12) (certified
English translation).

A.    **The 2003 *Habeas Corpus* Petition**

On January 17, 2003, Meléndez moved for federal relief pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEPDA"), 28 U.S.C. section 2254 ("section 2254"). See Meléndez-Serrano v. El Pueblo de Puerto Rico, Case No. 03-1050 (PG), Docket No. 1.) He completed the 2003 *habeas corpus* petition by answering in Spanish the matters on the English section 2254 form for state prisoners. Id. United States Magistrate Judge Jesús Antonio Castellanos ("Castellanos") denied Meléndez's motion for the appointment of counsel, incorrectly ordering **him** (not the Commonwealth respondents) to obtain and submit copies of the relevant post-conviction dispositions issued by the Puerto Rico appellate courts from his prison cell at the Bayamón 501 Correctional Institution. Id., Docket No. 8 (emphasis added) contra Pliler v. Ford, 542 U.S. 225, 232 (2004) ("[Petitioners] are not required by 28 U.S.C. § 2254 or the Rules Governing Section 2254 Cases to attach to their petitions, or to file separately, state-court records") (citing R. Hertz & J. Liebman, Fed. *Habeas Corpus* Practice & Procedure § 15.2c, p. 711 (4th ed. 2001) ("Most petitioners do not have the ability to submit the record with the petition, and the statute and rules relieve them of any obligation to do so and require the state to furnish the record with the answer.")).

Civil No. 20-1588 (FAB)                                             54

        The magistrate judge's order thus required that Meléndez
bear the responsibility of obtaining records from the Puerto Rico
Court of First Instance, the Puerto Rico Court of Appeals and
Puerto Rico Supreme Court to demonstrate exhaustion of state
remedies, a Herculean endeavor for a state prisoner without access
to the internet or sufficient funds.  Indeed, just three years ago
the Puerto Rico Department of Justice repeatedly attempted to
locate the same court records from the central registry and their
own files without success.  See Civil No. 20-1589, Docket No. 71,
Ex. 1 at p. 11 (e-mail from the Commonwealth of Puerto Rico Federal
Litigation and Bankruptcy Division detailing efforts to obtain
state court records).  Unsurprisingly, and because it was the
Commonwealth respondents' requirement, Meléndez did not file the
state court record.  Accordingly, and incorrectly, Magistrate
Judge Castellanos recommended that the Court dismiss Meléndez's
section 2254 petition for "failure to prosecute."  Serrano v. El
Pueblo de Puerto Rico, Case No. 03-1050, 2004 U.S. Dist. LEXIS
2766, at *3 (D.P.R. Jan. 28, 2004) (Castellanos, Mag. J.).  The
Court adopted Magistrate Judge Castellano's recommendation on

June 23, 2004, dismissing Meléndez's section 2254 petition with prejudice.  (Case No. 03-1050, Docket Nos. 14 and 15.)[21]

**B.    The 2011 Motion for a New Trial**

In 2010, a serological analysis of hairs recovered from Teresa's underwear excluded Meléndez and Ramos as the donors. (Docket No. 47 at p. 8.)  In sum, the hairs recovered from the crime scene belonged to a person other than Meléndez [or Ramos]. Id.  On February 10, 2011, Meléndez and Ramos moved for a new trial pursuant to Puerto Rico Criminal Procedure Rule 192.1 ("Rule 192.1"), citing "(1) the alleged inappropriate conduct of Prosecutor Andrés Rodríguez-Elías, and (2) new evidence based on the results of a serological test of three pubic hairs taken from underwear belonging to [Teresa] and one body hair found on a piece

---

[21] A dismissal for failure to prosecute operates as an adjudication on the merits. Fed. R. Civ. P. 41(b).  The Court notes, however, that Meléndez's 2003 _habeas corpus_ petition, though in an English language form document, was completed by Meléndez answering in Spanish.  Pursuant to the Jones Act, all "pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language."  48 U.S.C. § 864. This Court cannot "consider any untranslated documents placed before [it]." United States v. Millán-Isaac, 749 F.3d 57, 64 (1st Cir. 2014).  Accordingly, the Magistrate Judge could not have identified the causes of action or addressed the arguments contained in the 2003 _habeas corpus_ petition.  Another glaring mistake by the Magistrate Judge.

of clothing belonging to [her son]." Id. at p. 5.[22]  The Court of First Instance denied this motion for two reasons.  First, Meléndez and Ramos knew of the alleged misconduct at the time of trial but failed to assert a timely objection.  Cruz, 2019 WL 2232528, at *4. Second, serological hair comparisons "existed in 1992."  Id.  The Court of First Instance suggested that Meléndez and Ramos perform a mitochondrial deoxyribonucleic acid ("mtDNA") test, but this technology "was not [yet] available in Puerto Rico."  Id.

On January 29, 2016, the Puerto Rico legislature enacted the Post Judgment DNA Analysis Act, P.R. Laws Ann. tit. 34, sections 4201 et seq.  Cruz, 2019 WL 2232528, at *4.[23]  A month

---

[22] Puerto Rico courts "may in like manner at the request of the defendant grant a new trial if, after the sentence is pronounced, new facts or new evidence are found of a nature tending to establish defendant's innocence."  P.R. Laws Ann. tit. 34, R. 192.1.  Rule 192.1.1 provides that "[a]ny person who is imprisoned by virtue of a judgment rendered by any Division of the Court of First Instance" may move to vacate, set aside, or correct the judgment if:

    (1) The sentence was imposed in violation of the Constitution of the laws of the Commonwealth of Puerto Rico or of the Constitution and laws of the United States; or

    (2) The court lacked jurisdiction to impose such a sentence; or

    (3) The sentence imposed exceeds the penalty prescribed by law; or

    (4) The sentence is subject to collateral attack for any reason.

Id. R. 192.1.1.

[23] A certified English translation of the Post Judgment DNA Analysis Act is not yet available.  Neither has it been codified in the English version of Laws of Puerto Rico Annotated.  According to the Innocence Project, this legislation "grant[s] statutory access to DNA testing which could prove innocence and enable law enforcement to identify the truly guilty."  Nick Moroni, Puerto Rico Enacts Post-Conviction DNA Testing Law (Dec. 30, 2015) (available as of Nov. 11, 2022 at https://innocenceproject.org/puerto-rico-enacts-post-conviction-dna-testing-law/).

later, Meléndez and Ramos requested that the Court of First Instance allow the Puerto Rico Institute of Forensic Sciences ("IFS") perform an mtDNA analysis.  Id.  The Court of First Instance granted this motion without objection from the Puerto Rico Department of Justice.  Id.  This report excluded Meléndez and Ramos from the population of potential donors:  The hairs on Teresa's underwear belong either to her (the victim) or a matrilineal relative.  Id. at *5.

### C.    The 2016 Motion for a New Trial

Meléndez and Ramos subsequently filed a second motion for a new trial pursuant to Rule 192.1.  (Docket No. 39 at p. 14.) A new trial is warranted if:

> upon analyzing the new evidence along with the [evidence] presented during the original trial in the manner most favorable to the guilty verdict or ruling being challenged, **said evidence could have created reasonable doubt** in the trier of facts as to the guilt of the petitioner.

Cruz, 2019 WL 2232528, at *18 (citing Pueblo v. Marcano-Parrilla, 152 D.P.R. 557 (2000)) (emphasis in original); see People v. Morales-Rivera, 1984 PR Sup. LEXIS 87 (official translation), 115 D.P.R. 107 (1984) (noting that Courts adjudicate Rule 192.1 motions

by "[asking] whether said new evidence would have changed the guilty verdict in the present case").[24]

According to Meléndez and Ramos, the mtDNA report "irrefutably reveals that the pubic hairs collected from the panties belonging to Ms. Maymí do not belong to either of the two men unjustly convicted of this crime, whose motive was sexual assault and that, consequently, they are excluded as the murderers of Ms. Maymí and her two children." Cruz, 2019 WL 2232528, at *5. The Court of First Instance granted the Rule 192.1 motion and ordered a new trial. Id. at *8.

The Puerto Rico Department of Justice appealed. Id. at p. 9. The Puerto Rico Court of Appeals, in a 2-1 opinion by Judge Waldemar Rivera-Torres joined by Judge Luisa Colom-García, determined that the mtDNA evidence could not have been discovered in 1999, was not cumulative, and was credible. Cruz, 2019 WL 2232528, at *21-24. It disagreed, however, with the proposition that mtDNA is more credible than hair comparison despite explicit testimony that the mtDNA test is "more convincing." Id. at *24. The Puerto Rico Court of Appeals reversed the Court of First Instance on May 7, 2019. Id. On November 1, 2019, the Puerto

---

[24] To prevail on a Rule 192.1 motion, the petitioner must also establish that the newly discovered evidence "(1) could not have been discerned with reasonable diligence before trial; (2) is not merely cumulative; (3) is not rebuttal evidence; [and] (4) is credible." (Docket No. 52, Ex. 1 at p. 16) (citing Pueblo v. Rodríguez, 193 D.P.R. 987, 998-1000 (2015)).

Rico Supreme Court denied Meléndez and Ramos' subsequent petition for *certiorari*.  (Docket No. 47 at p. 10.)

### D.    The 2020 *Habeas Corpus* Petition

Meléndez filed a *pro se* section 2254 petition in this Court on October 27, 2020.  (Docket No. 1.)[25]  The Court (Judge William G. Young, sitting by designation) dismissed this petition on March 21, 2022 "for failure to prosecute."  (Docket No. 12.) The First Circuit Court of Appeals vacated the dismissal judgment, however, "[questioning] whether the district court would have dismissed for failure to prosecute had it been aware of the full extent of prior mailing issues [in the case], and [that] the dismissal, though expressly labeled 'without prejudice,' could have real ramifications, see 28 U.S.C. § 2244(d) (statute of limitations)."  Meléndez-Serrano v. Emanuelli-Hernández, Case No. 22-1316 (1st Cir. May 3, 2023) (Judgment).

On remand, on July 26, 2023, the Court granted Meléndez's motion for the appointment of counsel, ordering him to file an amended petition on August 18, 2023.  (Docket No. 29.)  After several motions for extension of time and a warning by the Court,

---

[25] Ramos also filed a section 2254 petition on October 27, 2020.  (Case No. 20-1589, Docket No. 1.)  The Court granted Ramos' petition for a new trial on September 30, 2024.  Ramos-Cruz, No. 20-1589 (FAB), 2024 U.S. Dist. LEXIS 179921 (D.P.R. Sept. 30, 2024).  The Commonwealth of Puerto Rico filed a notice of appeal.  Ramos-Cruz v. Martínez-Adorno, Case No. 24-2009 (1st Cir. 2024) (appeal docketed Nov. 7, 2024).

Meléndez filed an amended petition on November 9, 2023. (Docket No. 36.)  The Clerk of the Court then transferred this action to the undersigned judge on June 14, 2024. (Docket No. 37.)  Two months later, on August 8, 2024, Meléndez filed a second amended petition to resolve "procedural issues." (Docket Nos. 47 and 48.)

In this second amended petition, Meléndez sets forth three causes of action. (Docket No. 47.)  First, Meléndez contends that due process "require[s] a new trial based on [the mtDNA] evidence," Id. at p. 24, alleging that the Puerto Rico Court of Appeals purportedly erred by concluding that "the new mitochondrial DNA evidence was not likely to change the result at trial" in violation of clearly established federal law.  Id. at p. 35.  Second, he asserts that the Puerto Rico Court of Appeals relied on an "unreasonable determination of the facts in light of the evidence presented in the trial court evidentiary hearing." Id. at p. 39.   Third, Meléndez sets forth a claim of actual innocence.  Id. at p. 41.

The respondents then moved to dismiss the second amended petition, contending that this pleading constitutes a "second or successive" request for federal relief, falling within the purview of 28 U.S.C. section 2244(b) ("section 2244(b)").  (Docket No. 51 at p. 2.)  The Court denied the motion to dismiss on October 28, 2024.  Meléndez-Serrano v. Escobar-Pabón, Case No. 20-1588, 2024

U.S. Dist. LEXIS 197254 (D.P.R. Oct. 28, 2024) (Besosa, J.).  The
respondents subsequently filed their answer with certified English
translations of the 1992 trial transcripts, appellate
dispositions, and Rule 192.1 hearing on November 14, 2024 (Docket
No. 68,) and additional English translations on December 9, 2024
(Docket No. 75.)  The parties submitted their respective briefs on
December 6, 2024.  (Docket Nos. 73 and 74.)[26]

### III. The Anti-Terrorism and Effective Death Penalty Act

Federal *habeas corpus* review of a state-court conviction is
governed by the Anti-Terrorism and Effective Death Penalty Act.
Foxworth v. St. Amand, 570 F.3d 414, 424 (1st Cir. 2009); 28 U.S.C.
§ 2254.  Petitioners invoke the AEDPA to invalidate "the judgment
authorizing [their] confinement."  Magwood v. Patterson, 561 U.S.
320, 321 (2010) (citation and quotation omitted).  Congress enacted
this statute "to further the principles of comity, finality, and

---

[26] Meléndez invokes collateral estoppel, requesting that this Court "adopt its
conclusions of facts from Ramos-Cruz [Case No. 20-1589,] and apply them to this
case." (Docket No. 74 at p. 9.)  Collateral estoppel, a doctrine also referred
to as issue preclusion, "bar[s] successive litigation of an issue of fact or
law that is actually litigated and determined by a final judgment, and is
essential to the judgment." Sampson v. United States, 832 F.3d 37, 46 (1st
Cir. 2016) (citation and internal quotation omitted).  Courts have held,
however, that dispositions "subject to *de novo* review have not been considered
final for purposes of issue preclusion." Abbot GmbH & Co., KG v. Centocor Ortho
Biotech, Inc., 870 F. Supp. 206, 222 (D. Mass. 2012) (citing cases).  The
judgment issued by this Court in Ramos-Cruz is on appeal before the First
Circuit Court of Appeals. Ramos-Cruz, Case No. 24-2009 (1st Cir. 2024) (appeal
docketed Nov. 7, 2024).  A district court's "decision to grant or deny a *habeas*
petition under the AEDPA" is subject to *de novo* review. Hodge v. Mendonsa, 739
F.3d 34, 40 (1st Cir. 2013) (citation omitted).  Accordingly, the *habeas*
disposition issued in Ramos-Cruz is not a "final judgement" within the context
of issue preclusion.

federalism."  Kholi v. Wall, 582 F.3d 147, 154 (1st Cir. 2009)

(quoting Williams v. Taylor, 529 U.S. 420, 436 (2000)).  Courts

"shall entertain an application for a writ of *habeas corpus* . . .

only on the ground that [the petitioner] is in custody in violation

of the Constitution or laws or treaties of the United States."  28

U.S.C. § 2254(a).

A state court conviction will survive *habeas corpus* review

unless the adjudication:

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

Id. § 2254(d).  "[W]hen the last state court to decide a prisoner's

federal claim explains its decision on the merits in a reasoned

opinion [i.e. the Puerto Rico Court of Appeals' decision vacating

the new trial disposition], a federal *habeas* court simply reviews

the specific reasons given by the state court and defers to those

reasons if they are reasonable."  Porter v. Coyne-Fague, 35 F.4th

68, 75 (1st Cir. 2022) (quoting Wilson v. Sellers, 138 S. Ct. 1188,

1192 (2018)).

## A.    Section 2254(d)(2): Unreasonable Determinations of Fact

To prevail pursuant to section 2254(d)(2), Meléndez must demonstrate that the Puerto Rico Court of Appeals set forth factual determinations that are objectively unreasonable.    Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).    Section 2254(e)(1) also provides that:

> In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct.    The applicant shall have the burden of rebutting the presumption of the correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).    This provision is "equally applicable when a state appellate court, as opposed to a state trial court, makes a finding a fact."    Norton v. Spencer, 351 F.3d 1, 6 (1st Cir. 2003) (quoting Sumner v. Mata, 455 U.S. 591, 593 (1982)).

The "presumption of correctness" and "unreasonable determination" standards of review set forth in sections 2254(d)(2) and 2254(e)(1) both govern factual challenges to state court convictions, "[causing] some confusion" among the federal judiciary.    Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007).    The Supreme Court has suggested in *dicta*, however, that section 2254(d)(2) "would apply to the final decision reached by the state court on a determinative factual question, while section 2254(e)(1)'s presumption of correctness would apply to the

individual fact findings, which might underlie the state court's final decision." Id. at 58 (citing Miller-El, 537 U.S. at 341-42).

The relationship between sections 2254(d)(2) and 2254(e)(1) is a "question [that] remains open in this circuit." Quintanilla v. Marchilli, 86 F.4th 1, 17 (1st Cir. 2023). This Court need not determine which standard is applicable, however, because *habeas corpus* relief is warranted pursuant to both provisions. Id. (recognizing the tension between sections 2254(d)(2) and 2254(e)(1), but declining to "resolve the question" because the petitioner failed to satisfy either standard); Wood v. Allen, 558 U.S. 290, 304-05 (2010) ("Because the resolution of this case does not turn on them, we leave for another day the questions of how and when section 2254(e)(1) applies in challenges to a state court's factual determinations under section 2254(d)(2)").

## IV. The Puerto Rico Court of Appeals Relied on Unreasonable Determinations of Fact

The Court of First Instance ("CFI") granted Meléndez's motion for a new trial on June 13, 2017, holding that the "results of the DNA tests [. . .] is the type of new evidence that would make a different result probable." Cruz, 2019 WL 2232528, at *9. This

disposition was issued after a three-day evidentiary hearing and oral argument.  Id. at *4.

On March 13, 2019, the Puerto Rico Court of Appeals held that the "CFI clearly and unequivocally abused its discretion when it granted a new trial to [Meléndez and Ramos]."  Id. at *21.  This decision is fraught with unreasonable factual determinations, however, compelling this Court to grant the relief requested by Meléndez.  Specifically, the factual determinations regarding the fifth prong of the Rule 192.1 analysis rest on the Puerto Rico Court of Appeals' flawed and incomplete rendition of the record.

As a preliminary matter, the Puerto Rico Court of Appeals' decision contains *dicta* that is inconsistent with the record. Puerto Rico Court of Appeals disagreed with the CFI's finding that "the mtDNA is more convincing, conclusive and discriminating than the microscopic hair comparison."  Id. at *18.

Forensic serologist Roberto López-Arroyo ("López") stated that he conducts a hair comparison by "basically [placing] the hairs on a slide [under] a microscope and [observing] them." (Docket No. 68, Ex. 24 at p. 52.)  The comparison "depends on the [analyst's] power of observation."  Id. at p. 60.  López examined the sample and reference hairs, concluding that Meléndez and Ramos "were excluded" as donors.  Id. at p. 25.  His report stated,

however, that the hairs "must be submitted to a mitochondrial DNA analysis." Id. at p. 27.

Phillip Hopper ("Hopper"), a DNA analyst at the Serological Research Institute, testified that after DNA is extracted from a sample hair strand:

> mitochondrial DNA is copied in a process called amplification to make more copies of the mitochondrial DNA so [that analysts] can determine the exact sequence of [a] small portion of the mitochondrial DNA present in the hair.

(Docket No. 68, Ex. 25 at p. 17.) Analysts then identify the four components that comprise the "structure of DNA," label these components with "different color dyes," and "determine the exact order" of the resulting sequence. Id. at p. 18. "Once a sequence is determined, [analysts] can compare that sequence to the sequence from the victim [and] suspect." Id. at p. 18. The mtDNA analysis conducted by Hopper revealed that "the hairs from [Teresa's] clothing was different from the sequence of Mr. Meléndez and Mr. Ramos." Id. at p. 22. In Hopper's opinion, "the hairs found on [Teresa] could not have originated from the two suspects." Id.

López and Hopper both testified that the mtDNA analysis is more conclusive than a microscopic hair comparison. Id. at p. 53. Indeed, Hopper disclosed that "[hairs] from different people can look similar," and that he previously "tested other hairs which look similar [but] ended up giving different mitochondrial

results." Id. at p. 55.  The Court recognizes that microscopic hair comparison may, in certain circumstances, constitute credible evidence.  To undermine the CFI's determination that a mtDNA analysis is more conclusive than a microscopic hair comparison, however, defies logic and disregards testimony presented at the Rule 192.1 hearing.  Moreover, the CFI's determination regarding microscopic hair comparison corresponds to prevailing beliefs among the scientific community.[27]

### A.    No Evidence Suggests that the CFI Omitted Facts From its Rule 192.1 Analysis

The Supreme Court has held that a state appellate court's "determination of what the trial judge found is an issue of historical fact" subject to review pursuant to sections 2254(d)(2) and 2254(e)(1).  Parker v. Dugger, 498 U.S. 308, 320 (1991) ("What the Florida Supreme Court could not do, but what it did, was to ignore the evidence of mitigating circumstances in the record and misread the trial judge's finding regarding mitigating

---

[27] In 2009, the National Academies of Science determined that "testimony linking microscopic hair analysis with a particular defendant is highly unreliable.  In cases where there seems to be a morphological match (based on microscopic examination), it must be confirmed using mtDNA analysis; microscopic studies alone are of limited probative value."  Nat'l Academies of Sci., Strengthening Forensic Science in the United States (2009); see Samuel D. Hodge, Jr. and Amelia Holjencin, A post-Morten Review of Forensic Hair Analysis: A Technique Whose Current Use in Criminal Investigations in Hanging on by a Hair, 64 St. Louis L.J. 219, 228 (2020) ("The death knell of microscopic hair analysis in a forensic context occurred in April 2015 when the FBI issued a bombshell admission that members of its staff had provided inaccurate testimony dealing with microscopic hair analysis for more than twenty years thereby leading to the conviction of innocent people.").

circumstances, and affirm the sentence based on a mischaracterization of the trial judge's findings."); see Williams v. Rhodes, 354 F.3d 1101, 1108 (9th Cir. 2004) ("On *habeas* review, state appellate court findings – including those that interpret unclear or ambiguous trial court rulings – are entitled to the same presumption of corrections that we afford trial court findings" pursuant to section 2254(e)(1)). Accordingly, the Puerto Rico Court of Appeals' "determination of what [the CFI] said" is subject to *habeas corpus* review pursuant to sections 2254(d)(2) and 2254(e)(1).

The Puerto Rico Court of Appeals misconstrued the CFI's opinion and order, holding that the CFI "**ignored** important facts that could not be disregarded and, at the same time, assigned great weight and value to irrelevant and immaterial facts, clearly abusing its discretion." Cruz, 2019 WL 2232528, at *25 (emphasis added). For instance, the CFI cited testimony adduced by Eluzmindrina Feliciano-González, who placed Morales at Teresa's residence on June 27, 1989. Id. The Puerto Rico Court of Appeals held, however, that the CFI "**omitted** the fact that during the trial a second visual inspection was carried out for the sole purpose of verifying said testimony, since there was a distance of ten (10) houses between her house and the victim's house." Id. at *26. (emphasis added). The CFI allegedly "**disregarded** the testimonies

of the auto mechanic, Frank Álvarez-Navaro, and of Mr. Mario Antonio Salgado-Castrello ["Salgado"], as to the vehicle belonging to Mr. Eduardo Morales." Id. (emphasis added). Moreover, the Puerto Rico Court of Appeals held that the "CFI erred when it **failed to assess all of the evidence** admitted during the trial, and only considered part of the testimony to conclude that the new evidence would probably produce a different result." Id. at *27 (emphasis added). According to the Puerto Rico Court of Appeals, the CFI "should not have **ignored** the strength of the evidence presented in the trial, an important factor to be taken into account when considering a motion for a new trial." Id. at *29 (emphasis added). The CFI purportedly "[**ignored**], without any reason, the circumstantial evidence that was submitted during the trial." Id. at *29 (emphasis added).

    The CFI and Puerto Rico Court of Appeals' assessments of the evidence differed from each other. This disagreement does not, however, prove that the CFI "ignored," "disregarded," "omitted," or "failed to assess" evidence. A court need not enumerate every fact it considered in adjudicating a motion for a new trial in its written disposition. Rule 192.1 mandates that Puerto Rico courts analyze "new evidence along with the [evidence] presented during the original trial in the manner most favorable to the guilty verdict." Id. at *18 (citing Marcano-Parrilla, 152

D.P.R. 557).  Nothing in the record suggests that the CFI ignored
or omitted facts in its analysis.  In fact, the CFI reviewed the
trial evidence and listed exhibits provided by the Puerto Rico
Supreme Court.  (Docket No. 68, Ex. 23.)  The litigants also
provided the CFI with the trial transcripts.  Id. at p. 6.
Essentially, the absence of a fact in an opinion and order does
not necessarily establish that the court issuing the disposition
omitted or ignored this fact in its concomitant analysis.

        The Puerto Rico Court of Appeals faults the CFI for not
considering certain testimony from the trial record, a conclusion
based on a premise that has no support in the record.  Barring
evidence to the contrary, an appellate court presumes that the
trial judge reviewed the record.  See, e.g., United States v.
Wilfred Am. Educ. Corp., 953 F.2d 717, 719-20 (1st Cir. 1992) ("We
will not presume that the district court declined to consider the
relevant section 3622(a) evidence contained in the record");
United States v. Sutton, 105 F.4th 1083, 1088 (8th Cir. 2024) ("We
assume the record before us is a complete record of the materials
that the district court viewed and considered).  For example, the
Puerto Rico Court of Appeals refrained from addressing law
enforcement's failure to preserve the crime scene or the discovery
of the purported murder weapon at Morales' house months after the
murders.  This Court cannot infer, based on this premise alone,

that the Puerto Rico Court of Appeals ignored the haphazard destruction of evidence and questionable discovery of the knife in conducting its analysis.

The Puerto Rico Court of Appeals' flawed interpretation of the CFI's Rule 192.1 decision constitutes an "unreasonable determination of the facts." 28 U.S.C. §§ 2254(d)(1)-(e)(1). Accordingly, the Court **GRANTS** Meléndez's section 2254 motion and orders a new trial.

### B. The Puerto Rico Court of Appeals Misconstrued the Trial Evidence

The Puerto Rico Court of Appeals based its decision on an erroneous assessment of the record, constituting an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. In 1992, Bárbara and José both claimed that Ramos and Meléndez manufactured an "excuse" to enter Teresa's house on the night of her murder. José revealed that these fabrications served a singular purpose: to sexually assault Teresa. Testimony pertaining to this purported scheme is set forth below.

> **Rodríguez:** Mr. Witness, can you tell the ladies and gentlemen of the Jury what, if anything, happened once you arrived and placed yourself underneath that light pole, joining Mr. Juan Carlos Meléndez and Antonio Ramos-Cruz?

**José:** At that time, well, when my sister left [Teresa's] house and went to my house, uh . . . I stayed with them and we started making small talk . . .

**Rodríguez:** Talking.  What was that small talk?

**José:** You know, ordinary things, uh, things about work, and then we started talking about Teresa . . .

**Rodríguez:** What did you talk about Teresa?

**José:** Uh . . . what she was like, how she was, that she was really hot [. . .] And then, at that time we started talking jokingly about how to get with her to put it in her.

**Rodríguez:** To put it in her . . . In other words, who was in that conversation there at that time?

**José:** [Meléndez] and [Ramos][28]

[. . .]

**Rodríguez:** What, if anything, did you do when [Meléndez] mentioned the fact about putting it inside Teresa?

---

[28] The Court cites the certified English translation of the trial transcripts submitted by the Commonwealth pursuant to the Rules Governing Section 2254 Cases.  (Docket No. 68, Exs. 1-11.)  The decision issued by the Puerto Rico Court of Appeals does not state that Ramos and Meléndez "talked jokingly how to get with her to put it in her."  According to the court of appeals, José proffered the following testimony:

**Rodríguez:** What did you talk about regarding Teresa?

**José:** Im . . . what she was like, how she looked, that she was really fine [. . .]  Then, well we started talking at that time well we started talking jokingly about what it would be like to be with her, **to screw her.**

**Rodríguez:** To screw her . . . So, and who was there at that time in that conversation there?

**José:** [Meléndez] and [Ramos].

<u>Cruz</u>, 2019 WL 2232528, at *38 (emphasis added).

**José:** Well, at the moment . . . uh . . . at the moment I laughed . . . since we were joking around, I didn't take it seriously [. . .] and pretty much, no, like they say, I didn't, I didn't have that malice, and when he told me that, I kind of went with the flow, right? And at that moment we kept talking about that . . .

**Rodríguez:** What else did you talk about?

**José:** Well, how to get inside [Teresa's] house, uh, like how we were going to get inside [. . .] we were going to go inside, if when she came out, we were going to go inside, some excuse [. . .] At that time, well, Teresa came outside . . .

[. . .]

**Rodríguez:** And what happened when [Ramos or Meléndez] asked Teresa for water? If anything happened?

**José:** At that time, I was going to go to . . . to my house but one of them said, "This is the opportunity," and I said "Opportunity to what?" "To deal with her." And I said, "No, no, no, I am not going to be doing that; I am not going to be in the plot. "No, you sissy; fuck off." And then, well, I didn't . . . I ignored them and I left.

(Docket No. 68, Ex. 6 at pp. 92-97.)

**Bárbara:** At that point [Meléndez] told me to take [Teresa's] key . . .

[. . .]

**Rodríguez:** The keys to what?

**Bárbara:** To the house.

**Rodríguez:** for what, if you know?

**Bárbara:** I asked him, and he told me in order to have an excuse to talk to her. I went up to [Teresa's] house for moment and took them.

(Docket No. 68, Ex. 8, at p. 226-27.)  Testimony provided by the Martínez siblings served as the sole evidence linking Meléndez and Ramos to the crime scene.  No other circumstantial or physical evidence placed them inside Teresa's house in the early morning hours of June 26, 1989.

The mtDNA analysis performed on the hairs collected from Teresa's underwear exclude Meléndez and Ramos as the donors:  The hairs originated from Teresa herself or a matrilineal relative. (Docket No. 68, Ex. 3 at p. 22.)  Consequently, these results undermine critical testimony adduced at trial by Bárbara and José. Meléndez and Ramos allegedly conspired for hours on Calle 2 in Trujillo Alto, conjuring an excuse to initiate a conversation with Teresa to "put it in her."  Docket No. 68, Ex. 6 at p. 92; see Cruz, 2019 WL 2232528, at *37 ("If there's one thing that the undersigned judge can be sure it is that the only place that sexual aggression was eliminated from in these proceedings was from the charges, since the transcription of the trial on the merits indicates that the sexual act was the motivation for the commission of the crime of murder.") (Salgado-Schwarz, J., dissenting).  By eliminating Meléndez and Ramos as the source of the pubic hair recovered from the murder victim's underwear, the mtDNA analysis tends to negate the proposition that they sexually assaulted

Teresa.   This  evidence  contradicts  the  narratives  presented  by

Bárbara and José.[29]

        The  Puerto  Rico  Court  of  Appeals  assumed  an  extreme

position, denying  that  the  mtDNA  analysis  is  relevant  and  material

---

[29] The  Puerto  Rico  Court  of  Appeals  stated  that  "it  [did]  not  examine  the
theories  of  the  parties  stated  in  their  final  reports  contained  in  the
transcripts of the evidence of the original trial because they do not constitute
evidence."  Cruz,  2019 WL 2232528, at *22.  It did, however, in the following
sections  of  its  opinion.   The  Puerto  Rico  Court  of  Appeals  determined  that  "a
different  result  from  the  guilty  verdict  would  probably  [not]  be  reached"  in
part  because  the  "District  Attorney  argued  during  the  trial  that  the  motive  of
the  murder  was  having  sexual  relations  with  the  victim  (enjoying  her)."   Id.
at *31.

in any way to this case despite clear and convincing evidence to
the contrary.[30]

_____

[30] The distinction between legal analysis and findings of fact is paramount.
Section 2254(d)(1) governs the petitioner's request for _habeas corpus_ relief if
the state court "[applied] a legal rule that contradicts an established Supreme
Court precedent or [reached] a different result on facts materially
indistinguishable from those of a controlling Supreme Court precedent."
Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (quoting 28 U.S.C. §
2254(d)(1)). In contrast, a "state court's factual findings are entitled to a
presumption of correctness that can be rebutted only by clear and convincing
evidence [pursuant to sections 2254(d)(2) and 2254(e)(1)]." Ouber v. Guarino,
293 F.3d 19, 27 (2002). Distinguishing questions of law from fact "is sometimes
slippery." Thompson v. Keohane, 516 U.S. 99, 110-11 (1995) (citing Wainwright
v. Witt, 469 U.S. 412, 429 (1985) ("It will not always be easy to separate
questions of 'fact' from 'mixed questions of law and fact' for section 2254(d)
purposes.")).

The First Circuit Court of Appeals has held that section 2254(d)(1) applies
exclusively to determinations of "basic, primary, or historical fact," while
inferences, characterizations of the facts, and mixed questions of fact and law
generally fall within the purview of section 2254(d)(1). Ouber, 293 F.3d at
27. Section 2254(d)(1), the province of mixed questions of law and fact,
encompasses the application of a legal standard to the historical-fact
determinations." Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963). Courts have
applied section 2254(d)(2) to _habeas corpus_ petitions involving questions that
extend beyond the historical facts of the case. See Maggio v. Fulford, 462 U.S.
11, 117 (1983) (per curium) (applying section 2254(d)(2) to questions concerning
the defendant's competency to stand trial); Wainwright, 469 U.S. at 429 ("The
trial judge is of course applying some kind of legal standard to what he sees
and hears, but his predominant function in determining juror bias involves
credibility findings whose basis cannot be easily discerned from an appellate
record. These are the 'factual issues that are subject to section 2254(d).");
Tolbert v. Page, 182 F.3d 677, 684 (9th Cir. 1999) (applying section 2254(d)(1)
to the state court's determination regarding _prima facie_ showing of racial
discrimination and discriminatory intent pursuant to Batson); Jeffreis v.
Blodgett, 5 F.3d 1180, 1189 (9th Cir. 1993) (applying section 2254(d)(2) to a
question of alleged jury bias resulting from pretrial publicity).

Asserting that the mtDNA analysis is irrelevant to the murder conviction is a
factual determination requiring no application of any legal standard. The court
of appeals also assessed witness credibility, invoking the standard set forth
in section 2254(d)(2). See Cruz, 2019 WL 2232528, at *28 (holding that the
mtDNA tests as new supplementary evidence do not rebut the testimony of the
Martinez siblings (in terms of credibility)"). Accordingly, section 2254(d)(2)
is the operative _habeas corpus_ provision because this assessment constitutes a
"[fact] in the sense of a recital of external events and the credibility of
their narrators." Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (citation
omitted).

It repeated this misguided proposition throughout its decision, stating that:

> "The results of the mtDNA test as new supplementary evidence do not rebut the testimony of the Martínez siblings (in terms of credibility), and much less do they change the central facts as narrated by them and believed by the jury." Cruz, 2019 WL 2232528, at *28.

> "In short, the new evidence of the mtDNA results does not in any way diminish the evidentiary value of the testimony discussed [in the Court of Appeals' opinion]." Id.

> "[The mtDNA analysis] also does not allow us to rebut any of the central facts proven during the trial to create any doubt in terms of a third person being in the time and place of the murders." Id.

> "Furthermore, the new evidence alluded to by [Meléndez and Ramos] does not add or subtract any evidentiary value from the evidence presented during trial." Id.

> "[The] new supplementary evidence submitted lacks the element of having a certain level of importance with regards to the evidence submitted at trial." Id. at *31.

> "The defense's theory and the grounds on which they base their request for a new trial in no way rebut, minimize, or refute all of the evidence weighed by the jury in the trial resulting in the verdict of guilty." Id.[31]

---

[31] This Opinion and Order is based exclusively on sections 2254(d)(1) and 2254(e)(1). The unreasonable factual determinations set forth by the Court of Appeals entitle Meléndez to the remedies afforded to him by law. The Court notes, however, that the legal reasoning adopted by the Puerto Rico Court of Appeals is suspect. It does not cite, and this Court is unaware of, any authority requiring a defendant seeking relief pursuant to Rule 192.1 to "refute all of the evidence." Cruz, 2019 WL 2232528 at *31. The applicable standard merely mandates that the newly discovered evidence "could have created a reasonable doubt in the mind of the trier of facts." Id. at *18 (citing Marcano-Parrilla, 152 D.P.R. 557). Judge Carlos Salgado-Schwarz noted this misapplication of the law in his dissent, arguing that the CFI need not "undermine the evidence of the original trial" to grant the Rule 192.1 motion. Id. at *37.

"We reiterate that the results of the mtDNA test have no use whatsoever to place [Meléndez and Ramos] outside of the scene of the crime." Id. at *31.

"The new supplementary evidence also does not satisfy, as we have seen, the degree of relevance and sufficiency to rebut all the evidence submitted at trial." Id.

"[We] are forced to conclude that the new supplementary evidence does not have a direct or proportional relationship to the main fact that [Meléndez and Ramos] seek to prove, that is, that they are excluded in a true and incontrovertible manner from being at the scene of the crime or from having any contact with [Teresa] or her children." Id. at *32.

The Puerto Rico Court of Appeals repeatedly diminished the mtDNA analysis, failing to grasp the following fact: proof tending to exclude would-be rapists from a murder scene, particularly when sexual assault allegedly motivated the suspects in committing this offense, is relevant. See Espinal v. Bennett, 588 F. Supp. 2d 388, 418 (E.D.N.Y. 2008) (granting a habeas corpus petition pursuant to section 2254(d)(2) because the "state court unreasonably assessed the facts of this case by concluding that the redacted report did not support the petitioner's alibi claims"). Jurists may dispute the proper weight to assign the mtDNA analysis, but to completely reject the materiality of this evidence is an unreasonable determination of the facts. See Miller-El, 537 U.S. at 340 ("A federal court can disagree with a state court's credibility determination and, when guided by the

AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

The Puerto Rico Court of Appeals committed the same error regarding Teresa's underwear.  It held that "the female lingerie, as an article of evidence against [Meléndez and Ramos], was not material with regards to the guilty verdict."  Cruz, 2019 WL 2232528, at *30.  According to the Puerto Rico Court of Appeals, "the article of female clothing lacks relevance to prove the elements of the crimes of murder or a violation of the Weapons Act of which respondents were accused and found guilty."  Id.  Medical technologist Leida Rodríguez-Vélez testified, however, that there "was an absence of semen" on Teresa's shorts, underwear, and sweater.  (Docket No. 68, Ex. 6 at p. 18.)  Luis Campos observed pink underwear on Teresa at the crime scene.  (Docket No. 68, Ex. 3 at p. 57.)  The Puerto Rico Court of Appeals' classification of this evidence belies the trial record, constituting an unreasonable determination of fact.

This Court defers to the Puerto Rico Court of Appeals' factual determinations pursuant to section 2254.  Dunn v. Reeves, 584 U.S. 731, 733 (2021) ("Federal habeas courts must defer to reasonable state-court decisions").  Deference does not, however, "imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief."  Miller-El, 537 U.S.

at 340.  The record demonstrates, by clear and convincing evidence,
that the factual determinations adopted by the Puerto Rico Court
of Appeals are unreasonable.  Accordingly, the Court **GRANTS**
Meléndez's section 2254 petition and orders a new trial.

## V.  Conclusion

For the reasons set forth above, Juan Carlos Meléndez-
Serrano's second amended petition for *habeas corpus* relief is
**GRANTED**.  (Docket No. 47.)  A new trial is **ORDERED**.

The Commonwealth of Puerto Rico is directed to retry Juan
Carlos Meléndez-Serrano within sixty days or to release him from
custody.  Judgment shall be entered accordingly.

Because this final order is not adverse to Meléndez, the Court
need not issue or deny a certificate of appealability.  Rule 11 of
the Rules Governing Section 2254 Cases.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, December 13, 2024.


                                    s/ Francisco A. Besosa
                                    FRANCISCO A. BESOSA
                                    SENIOR UNITED STATES DISTRICT JUDGE